**In the Interest of S.G., a Minor,**

**Appeal of: H.G., Natural Mother.**

**In the Interest of V.G., a Minor.**

Superior Court of Pennsylvania.

Submitted Jan. 22, 2007.
Filed April 12, 2007.

Matthew W. Lent, Altoona, for appellant.

Terressa E. George, Altoona, for S.G. and V.G., appellees.

William Brenner, Holidaysburg, for Blair County, CYS, appellee.

BEFORE: MUSMANNO, McCAFFERY, and JOHNSON, JJ.

OPINION BY McCAFFERY, J.:

¶ 1 Appellant, H.G. ("Mother"), appeals from the court order that changed the placement goal to adoption for two of her minor children, a boy, S.G., born in January 1999, and a girl, V.G., born in April, 2000.[1] Mother asks us to determine whether the trial court erred in changing the placement goal to adoption despite Mother's progress in addressing her mental health issues. Following careful review, we affirm.

¶ 2 The relevant facts and procedural history underlying this appeal are as follows. Mother and her children came to the attention of Blair County Children and Youth Services ("CYS") in early 2002.[2]

---

1. S.G. and V.G. have different fathers, neither of whom is a party to this action. S.G.'s father was indicated of sexually abusing S.G. in July 2003. V.G.'s father, who was initially misidentified as the same man who fathered Mother's three younger children, has not been involved in her life.

2. Some portions of the certified record indicate that CYS's involvement with this family began as early as 2000. From the record, we are unable to determine whether CYS initially became aware of the family in 2000 or 2002. The discrepancy does not affect our disposition of this case.

Periodically since that time, CYS has stepped in to address concerns related to neglect, sexual and physical abuse, domestic violence, Mother's mental health, and the children's behavioral and developmental issues. Numerous agencies, including General Protective Services; Altoona Hospital Family Based Mental Health Services; Family Intervention Crisis Services ("FICS"), both Preservation and Reunification services; Early Intervention; and Home Nursing Agency, have provided various services to the family, to Mother, and to each of the children over a period of several years.

¶ 3 On April 2, 2004, S.G. and V.G. were declared dependent after Mother and her then-boyfriend, R.K., made clear their intention to move to Virginia and live with R.K.'s brother, a man known to CYS as a perpetrator of sexual abuse. Although declared dependent, the children remained in Mother's custody, subject to the condition that FICS or a similar agency continued to provide services to the family. Mother apparently did not move to Virginia and has continued to reside in Blair County. For several months, FICS personnel were in Mother's home on an almost daily basis to try to address issues related to domestic violence, parenting skills and supervision, and medication-monitoring for Mother and the children. In August 2004, Mother filed a protection from abuse action against R.K., who temporarily left Mother's residence. Following a hearing on September 22, 2004, S.G.'s and V.G.'s dependency status was lifted, on conditions that CYS continued to provide general protective services and FICS continued to provide preservation services to the family. The family also continued to receive mental health services.

¶ 4 On July 22, 2005, CYS received a referral that S.G. had facial bruises, which he stated were the result of Mother's having hit him. After Mother acknowledged hitting S.G., she consented to emergency voluntary placement, and S.G. was placed in a foster home.[3] A hearing was held on August 19, 2005, after which S.G. was again declared dependent, with a placement goal of returning home to Mother with whom he had an emotional bond.

¶ 5 S.G. and Mother continued to receive intensive services. Mother complained that she suffered from "black-outs" when stressed, after which she could not remember events that had transpired. To address Mother's continuing psychological and mental health issues, she received individual outpatient therapy from the Home Nursing Agency and medication-monitoring through Altoona Hospital Behavioral Health Services. Because of S.G.'s behavioral problems, he was treated by a psychiatrist at Altoona Hospital Behavioral Health Service, saw a behavioral specialist through Home Nursing, and received individual counseling twice a month with therapist Marion Henry. The family also was the recipient of FICS Preservation and FICS Reunification services.

¶ 6 In December 2005, despite the ongoing, intensive and varied services provided, Mother's domestic situation deteriorated, with increasing arguments between her and R.K. as well as the addition of two other adults to the household. Mother also failed to attend many of her mental health appointments during this period of time. On December 13, 2005, an incident occurred during a home visit with S.G. that led to removal of all the children from the household. During the visit, S.G. had

---

**3.** Mother pled guilty to a charge of recklessly endangering a child as a result of this incident and S.G.'s injuries.

started to act out with dangerous, inappropriate, defiant behaviors, and Mother's physical response only escalated a volatile and potentially dangerous situation. When the FICS educator accompanying S.G. attempted to re-focus Mother's response in a more positive direction, Mother became verbally abusive toward the educator, causing the educator to end the visit prematurely. As the educator was leaving with S.G., Mother expressed concern as to her own behavior toward the other children in the home. After assessing the situation with FICS personnel, CYS determined that emergency placement of V.G. and her two younger siblings was necessary for their protection. Mother signed an emergency voluntary placement agreement and the three children were removed from the home.

¶ 7 At a hearing on January 5, 2006, the court declared that V.G. was a dependent child and S.G. continued to be a dependent child. A placement goal for both children was established as "other planned living arrangement intended to be permanent." The court expressly determined that Mother's unstable mental health left her incapable of providing a safe and secure environment for the children. Notably, Mother had to be removed from the courtroom during the hearing because of her disruptive, unruly, emotional behavior which prevented orderly proceedings.

¶ 8 On May 18, 2006, CYS filed a petition to change the placement goal for both S.G. and V.G. to adoption. A hearing was held on June 8 and 9, 2006, before the Honorable Hiram A. Carpenter, III, during which the court heard from several witnesses: Dr. Beth Bollinger, a psychiatrist with the Home Nursing Agency who had performed a mental health evaluation of Mother and was also her treating physician; Ms. Helen Kaufman, the primary counselor for Mother from the Home Nursing Agency; Ms. Marion Henry, S.G.'s counselor since February 2005; Ms. Helen Morrow, CYS caseworker for the family during the past two years; and Mother. Undisputed testimony indicated that, although the children had continued to have some behavioral and developmental problems, they both had made substantial progress while in foster care. Based on the children's need for stability and permanence in order to continue their progress and on Mother's inability to achieve the goals necessary for return of her children or even to engage consistently in therapy for her many mental health problems, the court granted the goal change to adoption.

■ ¶ 9 Mother filed a motion for reconsideration, which the court denied after entertaining oral argument thereon. Mother then filed an appeal to this Court, raising the following single issue for our review:

> Did the lower court abuse its discretion in directing a goal change of adoption for the minor children, [S.G. and V.G.], because the lower court disregarded substantial evidence of the Mother's compliance with permanency goals including progress in addressing her mental health issues?

(Mother's Brief at 4).

■ ¶ 10 Initially, we note our standard of review:

> When we review a trial court's order to change the placement goal for a dependent child to adoption, our standard is abuse of discretion. In order to conclude that the trial court abused its discretion, we must determine that the court's judgment was manifestly unreasonable, that the court did not apply the law, or that the court's action was a result of partiality, prejudice, bias or ill will, as shown by the record. We are bound by the trial court's findings of fact

that have support in the record. The trial court, not the appellate court, is charged with the responsibilities of evaluating credibility of the witnesses and resolving any conflicts in the testimony. In carrying out these responsibilities, the trial court is free to believe all, part, or none of the evidence. When the trial court's findings are supported by competent evidence of record, we will affirm even if the record could also support an opposite result.

> *In re N.C.*, 909 A.2d 818, 822–23 (Pa.Super.2006) (citations and quotations omitted).

¶ 11 Next, we note that in matters of placement for a dependent child, the trial court must be guided by the best interests of the child—not those of his or her parents. *Id.* at 823.

Placement of and custody issues pertaining to dependent children are controlled by the Juvenile Act,[4] which was amended in 1998 to conform to the federal Adoption and Safe Families Act ("ASFA").[5] The policy underlying these statutes is to prevent children from languishing indefinitely in foster care, with its inherent lack of permanency, normalcy, and long-term parental commitment. Consistent with this underlying policy, the 1998 amendments to the Juvenile Act, as required by the ASFA, place the focus of dependency proceedings, including change of goal proceedings, on the child. Safety, permanency, and well-being of the child must take precedence over *all* other considerations, including the rights of the parents.

\* \* \* \*

When the child welfare agency has made reasonable efforts to return a foster child to his or her biological parent, but those efforts have failed, then the agency must redirect its efforts towards placing the child in an adoptive home. This Court has held that the placement process should be completed within 18 months.

\* \* \* \*

While this 18–month time frame may in some circumstances seem short, it is based on the policy that a child's life simply cannot be put on hold in the hope that the parent will summon the ability to handle the responsibilities of parenting.

> *N.C., supra* at 823–24 (citations and quotations omitted; footnotes and emphasis in original).

¶ 12 In the case *sub judice,* Mother contends that the trial court disregarded evidence of her compliance with permanency goals, her progress in mental health counseling, the short time that V.G. has been dependent, and the bond between Mother and the children. The record belies Mother's contentions. Furthermore, Mother's arguments as presented in her brief focus almost entirely on *Mother's* conduct, seemingly ignoring the fact that the focus of dependency proceedings is on the *child*—not on the parent. *See N.C., supra* at 822–24.

¶ 13 Tellingly, Mother ignores the undisputed testimony that the children had improved substantially in school and social activities since their removal from her home. Helen Morrow, who had been the family caseworker during the previous two years, indicated that both children not only were improving but also were happier in the environment provided by their respec-

---

4. 42 Pa.C.S.A. §§ 6301–65.

5. 42 U.S.C. § 671 *et seq.*

tive foster families. (Notes of Testimony ("N.T."), 6/8/06, at 79, 81, 83). S.G., who was seven years old at the time of the hearing and had been diagnosed with post-traumatic stress disorder ("PTSD") and attention deficit hyperactivity disorder, was responding favorably to positive reinforcement in his foster home despite having ups and downs in controlling his impulsive behavior. (*Id.* at 68–69). V.G., who was six years old at the time of the hearing, had been diagnosed as "mildly retarded" when she first entered foster care. (*Id.* at 80). However, six months later, at the time of the hearing, it was clear that she had made a lot of progress with regard to her school work, her emotional affect, and her behavior, and the original diagnosis was being questioned in favor of simply a delay in social development. (*Id.* at 80–81). V.G. had changed from a child who was sullen and rarely smiled in school to one who would talk and laugh and giggle. (*Id.* at 81). Her behavior had improved so much that one aspect of her therapy was scheduled to be discontinued shortly after the hearing. (*Id.* at 82).

¶ 14 Both children were involved with the activities of their respective foster families. S.G. volunteered to Ms. Morrow that he really liked living in his foster home and did not want to go anyplace else. (*Id.* at 73). Ms. Morrow testified that there was definitely a bond between S.G. and his foster parents, whom he called mom and dad. S.G. referred to Mother by her first name or as his "other mom." (*Id.* at 74). While Ms. Morrow acknowledged that S.G. did indeed have a bond with Mother, she further testified that he also had a bond with his foster mother on whom he had become more dependent because he did not view Mother as someone upon whom he could depend. (N.T., 6/9/06, at 7–8). Ms. Morrow testified that S.G.'s foster parents were committed to S.G. for "the long haul" and noted in particular the pa-

tience, skill, and understanding exhibited by the foster mother in dealing with S.G., who continued to be a difficult child to parent. (N.T., 6/8/06, at 74–75).

¶ 15 None of the testimony concerning the children's substantial progress since their removal from Mother's home was disputed, and it constitutes strong evidence in support of the trial court's determination that goal change to adoption is in the best interest of both children.

¶ 16 Prior to making its determination, the trial court also thoroughly considered evidence as to the likelihood that Mother could and would recover mental health and develop sufficient parenting skills such that she could care for her children. No one, not even Mother, argued that she was capable of assuming parental duties at the time of the hearing. The trial court noted that Mother's parenting classes had been suspended for the time being because Mother had so many other issues on which to focus and she had not benefited from prior parenting education. After considering all the evidence, the trial court determined that Mother would require years of intensive therapy and disciplined effort if she were to overcome her numerous mental health problems. Furthermore, given Mother's long history of unsuccessful psychiatric treatment and counseling, there were no guarantees that, this time, therapy would be successful. (*See* Trial Court Opinion at 1–8, 11–14). The trial court's determinations are well-supported by the record evidence.

¶ 17 In particular, the testimony of Dr. Bollinger, a psychiatrist who had evaluated Mother's mental health and was attempting to treat her, was important to the trial court's determinations. Dr. Bollinger diagnosed Mother as suffering from numerous mental disorders, including PTSD, generalized anxiety disorder, attention def-

icit disorder, amnestic disorder, intermittent explosive disorder, and depression not otherwise specified. (N.T., 6/8/06, at 19). With all these interrelated problems, Mother's level of functioning was low, such that her ability to care for herself was affected and her capacity to manage her life was limited. (*Id.* at 21–22, 48–49). Although Dr. Bollinger opined that Mother was aware that she was quite ill, had serious problems, and needed help, Dr. Bollinger also opined that Mother had little understanding of her situation despite her years of therapy. (*Id.* at 18). Specifically with regard to Mother's understanding, Dr. Bollinger testified as follows: "[Mother] still doesn't quite grasp why she has to go through all the steps and take the medicine and go to the therapy and what she has to do to get the children back when she simply feels she should have them back [because] she loves them." (*Id.* at 40; *see also id.* at 54). While Dr. Bollinger acknowledged that Mother loved her children, Dr. Bollinger also expressed concern about Mother's "ability to apply herself in a therapeutic setting to gain enough knowledge [to become] an effective and good parent." (*Id.* at 22). Finally, Dr. Bollinger concluded that Mother's prognosis for recovery was "guarded" given her long psychiatric history, her own very traumatic childhood, and the intensive therapeutic efforts that would be required for psychological healing. (*Id.* at 17, 23).

¶ 18 The likelihood that Mother was willing and able to engage in such intensive efforts was further diminished by Dr. Bollinger's testimony that Mother had missed several psychiatric appointments in the weeks before the hearing. Mother had no explanation for the missed appointments.[6]

The trial court considered this testimony very significant, and reasonably interpreted it as evidence that Mother still lacked any sense of urgency with regard to her mental health problems and would not sufficiently recover in time to meet the needs of her children. (*See* Trial Court Opinion at 13).

¶ 19 In Mother's argument to the contrary, she relies on the testimony of Helen Kauffman, Mother's counselor with the Home Nursing Agency, with whom Mother had been meeting for group therapy three days a week since February 2006, to address issues related to anger management, depression, self-esteem, and anxiety. Ms. Kauffman testified that, although Mother was initially disruptive in the group sessions, within a short period of time she started to show improvement and had become more cooperative and engaged with the process. (N.T., 6/9/07, at 31–32, 34). However, contrary to Mother's implications, Ms. Kauffman's view of Mother's recent progress was far from unqualified. Like Dr. Bollinger, Ms. Kauffman opined that Mother's understanding of her situation and the treatment that she needs is limited. Specifically, with regard to Mother's understanding, Ms. Kauffman testified only that Mother "can recognize that she needs to learn how to control the anger ... and [Mother is] able to identify [that] she does have some depression." (*Id.* at 45). Furthermore, Ms. Kauffman testified that from February 2006, when Mother started this phase of counseling, until June 2006, when the hearing was held, Mother had had three unexcused absences; upon a fourth unexcused absence, the recommendation might be discharge from the program. (*Id.* at 28–29). Thus, while there is

6. Mother's brief does not dispute that Mother failed to appear for several appointments with Dr. Bollinger, but simply disregards these missed opportunities, noting that Dr. Bollinger expressed her willingness to continue to try to provide treatment to Mother despite her noncompliance.

some evidence that Mother has made a small degree of recent progress, that progress must be viewed and weighed in the context of her limited understanding of her circumstances and her continuing inability to take full advantage of the therapeutic opportunities presented to her.

¶ 20 It is abundantly clear from the trial court's comprehensive opinion that the court considered *all* of the evidence discussed above before arriving at its decision to grant the goal change to adoption. The court properly focused on the best interests of the children, weighing heavily the substantial improvements in their ability to function at home and at school since placement into foster care. The court also gave consideration to evidence concerning the likelihood that Mother would ever reach the point where she could care not only for herself but also for her children. Sadly, the evidence overwhelmingly supports the trial court's finding that, after many years of unsuccessful therapy, Mother's mental health issues remain serious impediments to her ability to function and to parent her children.

¶ 21 Whether Mother has the ability and the discipline to devote herself to the intensive therapy that could—but not necessarily would—lead to recovery is purely speculative. As the trial court correctly pointed out, the children simply cannot wait for a determination of what the future holds for Mother's mental health. The record establishes a pattern over the last several years in which Mother made some progress and then suffered a severe and sometimes violent setback, despite CYS's involvement and the provision of a variety of services. While the trial court acknowledged that it could not say with absolute certainty where this pattern would end, there is no question that the children need permanence and stability *now*. Our law mandates that in matters of dependency

we place the interests of the children before those of the parent. The children's best interests require that they mature in a stable home environment with the guidance of loving parents where they can continue to progress. Mother has shown herself to be incapable of providing that life with any consistency in the past, and she offers now only speculation about her future abilities. The trial court determined that such speculation did not constitute a sufficient reason to delay a change in placement goal to adoption. Because we conclude that the trial court's determination is well-supported by the evidence of record, we will not disturb it.

¶ 22 Order affirmed.

