J-S22032-18

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37**

| | | |
|---|---|---|
| IN THE INTEREST OF M.C.K., A MINOR | : | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| | : | |
| | : | |
| | : | |
| APPEAL OF: J.C.M.K. A/K/A J.K., MOTHER | : | |
| | : | |
| | : | |
| | : | |
| | : | |
| | : | No. 3330 EDA 2017 |

Appeal from the Decree Entered September 13, 2017
in the Court of Common Pleas of Philadelphia County
Family Court at Nos: CP-51-AP-0000490-2016
CP-51-DP-0002114-2015

BEFORE: BENDER, P.J.E., STABILE, J., and PLATT*, J.

MEMORANDUM BY PLATT, J.:            **FILED SEPTEMBER 11, 2018**

J.C.M.K. a/k/a J.K. (Mother) appeals from the decree of the Court of Common Pleas of Philadelphia County (trial court), entered September 13, 2017, that terminated her parental rights to her daughter, M.C.K. (Child), born in July of 2015, and changed Child's goal to adoption.[1]

Child came into foster care a few days after her birth in July of 2015 pursuant to a General Protective Services (GPS) report received by the Department of Human Services (DHS) on July 27, 2015. (*See* N.T. Hearing, 9/13/17, at 10; DHS Exhibit 4). The GPS report alleged that Mother was not prepared to care for Child because she was homeless and had diminished

_____

[1] The identity of Child's father is unknown. Three different men were ruled out through paternity testing. (*See* N.T. Hearing, 9/13/17, at 9).

_____

\*    Retired Senior Judge assigned to the Superior Court.

mental capacity. (*See* N.T. Hearing, at 12; DHS Exhibit 4, at 2). Mother has a diagnosed history of schizophrenia, depression, anxiety and post-traumatic stress disorder. (*See* DHS Exhibit 4, at 3). Mother's mental health was so impaired that the hospital was unable to complete a mental health evaluation. (*See* N.T. Hearing, at 12). DHS secured an Order of Protective Custody (OPC) and placed Child in foster care. (*See id.* at 12-13).[2] The court appointed a guardian *ad litem* and legal counsel for Child. On July 31, 2015, the court referred Mother to the Clinical Evaluation Unit (CEU) for a dual diagnosis assessment and drug screen. On August 20, 2015, it referred Mother for a psychiatric evaluation and a parenting capacity evaluation (PCE), and appointed a guardian *ad litem* for her. The trial court adjudicated Child dependent on September 10, 2015, and committed Child to DHS.

Mother's Single Case Plan (SCP) objectives were to follow all mental health treatment recommendations; sign consents and release of information forms; attend Child's medical appointments; submit to a PCE and follow all recommendations; comply with court ordered visitation; and continue to attend Family School. (*See id.* at 16). Mother attended three of the eight SCP meetings held in her case. (*See id.* at 14).

---

[2] Child remained in the same foster home at the time of the termination hearing.

On December 11, 2016, forensic psychiatrist Dr. William Russell issued his written PCE report on Mother. Dr. Russell conducted a clinical interview of Mother on October 27, 2016, after conducting psychological tests on Mother and obtaining and reviewing her records. (*See* DHS Exhibit 3). He was unable to obtain Mother's records from Warren E. Smith Health Center (WES), where she began treatment in December of 2015. (*See* N.T. Hearing, at 18, 64). He conducted the PCE to determine Mother's capacity to provide safety and permanency for Child. (*See id.* at 64).

During her interview with Dr. Russell, Mother presented "a very chaotic developmental history[,]" including placement in foster care and multiple psychiatric hospitalizations. (*Id.* at 66). Mother disclosed a diagnosis of schizophrenia and a history of auditory and visual hallucinations that she continued to experience both when on and off her psychotropic medication. (*See id.* at 69; DHS Exhibit 3, at 3). Hallucinations and mood issues are at the top of the list of active psychiatric symptoms. (*See* N.T. Hearing, at 88). Mother admitted a history of non-compliance with taking her medication and was unable to understand the significance of her non-compliance. (*See id.* at 70). The results of Mother's Minnesota Multiphasic Personality Inventory (MMPI-2) testing generated a variety of symptoms consistent with schizophrenia. (*See id.* at 70-71). Mother lacked housing, had never sustained any employment, and subsisted on Social Security Supplemental

Disability Income she received for her mental health issues. (**See id.** at 67, 72).

Dr. Russell stated as his professional opinion that Mother lacked the capacity to provide safety and permanency for Child. According to Dr. Russell, Mother lacked stability in every area of her life. The deficits in her day-to-day functioning and her history of debilitating mental health impaired her insight and judgment. (**See id.** at 72-73). Even with treatment and medication, Mother's mental illness "impacted her ability to function appropriately in day to day activities[,]" precluding the capacity to parent or care for Child. (**Id.** at 73; **see id.** at 74-75). Dr. Russell recommended that Mother follow all medication protocols, comply with her therapy routine, follow the directions of her case manager regarding obtaining appropriate housing, develop a financial plan, and continue to participate in visitation with Child.[3] (**See id.** at 81-85; DHS Exhibit 3, at 11).

DHS filed its petitions to involuntarily terminate Mother's parental rights to Child and to change Child's goal to adoption on May 26, 2016. The trial court held a hearing on those petitions on September 13, 2017. At the hearing, DHS presented the testimony of Community Umbrella Agency (CUA) Turning Points for Children case manager Chaunteria Flowers and Dr. Russell.

---

[3] Dr. Russell did not opine as to the relationship between Mother and Child. (**See** N.T. Hearing, at 85).

- 4 -

Mother was present, but did not testify on her own behalf nor did she present any evidence in her defense.

Ms. Flowers testified that Mother had begun mental health treatment at WES in December of 2015 and remained in the program as of September 13, 2017. (*See* N.T. Hearing, at 17-18). Mother had a history of not being compliant with taking her pill form of medication, either failing to take it or to renew her prescription, resulting in her psychiatrist switching her to monthly injections as of July 28, 2016. (*See id.* at 18-19). The facility did not provide Ms. Flowers with documentation of Mother's compliance with the monthly shots. (*See id.* at 55).

Child has various medical issues requiring ongoing medical appointments with her primary care physician; gastrointestinal specialist; pulmonary specialist for her asthma; and an ear, nose and throat specialist for her Lingual Malacia and acid reflux. (*See id.* at 21, 46). Prior to Ms. Flowers assuming the case in March 2016, Mother was not attending Child's medical appointments. (*See id.* at 22). Since March 2016, Mother only attended medical appointments when Ms. Flowers transported her to them; otherwise, on her own, Mother was unable to figure out how to get there. (*See id.* at 22-24). At the appointments, Mother could not identify the doctor after having been introduced already, and was unable to process the information provided at the visits, looking to Ms. Flowers for explanations. (*See id.* at 25-26). Mother's lack of understanding of Child's medical condition

severely limited her ability to parent Child. (*See id.* at 26). Further, Mother failed to inquire as to Child's well-being. (*See id.* at 38). Ms. Flowers expressed concerns regarding Mother's capacity to parent because of her inability to comprehend Child's medical conditions, failure to take her own medication, continuing hallucinations, lack of housing, and her arrest for dancing naked on the highway, thereby posing a safety threat to Child's well-being. (*See id.* at 28-30, 39-40).

Mother lacked an understanding of her finances and was unable to budget. Upon leaving a shelter in January 2017 with $2,400.00 for housing, Mother gave a majority of the money to her son's grandmother with whom she was then living. (*See id.* at 32-33). Mother then moved into her maternal grandmother's home which was inappropriate for Child as it lacked appropriate space. Mother continued to give money to her son's grandmother and, as a result, Mother was unable to save for appropriate housing and expressed no intention of moving from her grandmother's home, notwithstanding her apparent awareness that her housing situation precluded reunification with Child. Providing Mother with a security deposit for a home would not alter the fact that her inability to budget would render her unable to make rent payments. (*See id.* at 37). Mother failed to comply with the recommendations of her PCE. (*See id.* at 53).

Mother has always had supervised visits with Child and only started to be consistent with her visitation as of March of 2016. (*See id.* at 20-21).

Child gets upset when first dropped off for the visits, and cries for an extended period. She is distressed when she must separate from her foster mother. (*See id.* at 41). However, Mother acts appropriately during the visits, other than not knowing how to handle Child's crying, and Child is getting used to seeing her. (*See id.* at 41, 60).

Child has lived in her pre-adoptive home since birth and is completely bonded with her foster mother with whom she shares a loving relationship and a parent-child bond. (*See id.* at 41-42). According to Ms. Flowers, the termination of Mother's parental rights and a goal change for Child to adoption are in Child's best interest. (*See id.* at 42). She also opined that, although severance of Child's relationship with Mother will not cause Child irreparable harm, severance of Child's relationship with her foster mother would. (*See id.* at 42-43).

The trial court entered its decree terminating Mother's parental rights to Child and changing Child's goal to adoption on September 13, 2017. Mother filed her notice of appeal and concise statement of errors complained of on appeal on October 6, 2017. *See* Pa.R.A.P. 1925(a)(2)(i). The court filed an opinion on December 21, 2017. *See* Pa.R.A.P. 1925(a)(2)(ii).

Mother raises the following questions for our consideration:

1. Did the trial court abuse its discretion by granting [DHS'] Petition to Change the Goal to Adoption pursuant to the Juvenile Act 42 Pa.C.S.[A.] §6301 because Mother was still a viable reunification resource?

2. Did the trial court err and abuse its discretion by finding that DHS proved by clear and convincing evidence that Mother failed to rehabilitate herself pursuant to 23 Pa.C.S.[A.] Section[s] 2511(a)(1), (2), (5), (8) in that she attained mental health stability by regularly attending therapy and consistently taking her medication?

3. Did the trial court abuse its discretion by giving too much weight to Dr. Russell's testimony that Mother could not safely parent her child because Dr. Russell's opinion was based on his interview and other information from 11 months prior to the trial, and since that time Mother had been stabilized on new medication and was consistently attending therapy?

4. Did the trial court err by finding that Mother failed to comply with her mental health goal despite the fact that she had been stabilized on medication and attending outpatient therapy three days per week since approximately December, 2015?

(Mother's Brief, at 4).

Our standard of review is as follows:

In an appeal from an order terminating parental rights, our scope of review is comprehensive: we consider all the evidence presented as well as the trial court's factual findings and legal conclusions. However, our standard of review is narrow: we will reverse the trial court's order only if we conclude that the trial court abused its discretion, made an error of law, or lacked competent evidence to support its findings. The trial judge's decision is entitled to the same deference as a jury verdict.

*In re L.M.*, 923 A.2d 505, 511 (Pa. Super. 2007) (citations omitted).

Further, we have stated:

Where the hearing court's findings are supported by competent evidence of record, we must affirm the hearing court even though the record could support an opposite result.

We are bound by the findings of the trial court which have adequate support in the record so long as the findings do not evidence capricious disregard for competent and credible evidence. The trial court is

- 8 -

free to believe all, part, or none of the evidence presented, and is likewise free to make all credibility determinations and resolve conflicts in the evidence. Though we are not bound by the trial court's inferences and deductions, we may reject its conclusions only if they involve errors of law or are clearly unreasonable in light of the trial court's sustainable findings.

*In re M.G.*, 855 A.2d 68, 73-74 (Pa. Super. 2004) (citations omitted).

We note our standard of review of a change of goal:

When we review a trial court's order to change the placement goal for a dependent child to adoption, our standard is abuse of discretion. In order to conclude that the trial court abused its discretion, we must determine that the court's judgment was manifestly unreasonable, that the court did not apply the law, or that the court's action was a result of partiality, prejudice, bias or ill will, as shown by the record. . . .

*In the Interest of S.G.*, 922 A.2d 943, 946 (Pa. Super. 2007) (citation omitted).

Here, the trial court terminated Mother's parental rights pursuant to 23 Pa.C.S.A. § 2511(a)(1), (2), (5), (8), and (b). In order to affirm the termination of parental rights, this Court need only agree with any one subsection of Section 2511(a). *See In re B.L.W.*, 843 A.2d 380, 384 (Pa. Super. 2004) (*en banc*), *appeal denied*, 863 A.2d 1141 (Pa. 2004). Requests to have a natural parent's parental rights terminated are governed by 23 Pa.C.S.A. § 2511, which provides, in pertinent part:

**§ 2511. Grounds for involuntary termination**

**(a) General rule.**—The rights of a parent in regard to a child may be terminated after a petition filed on any of the following grounds:

\*　　\*　　\*

(8) The child has been removed from the care of the parent by the court or under a voluntary agreement with an agency, 12 months or more have elapsed from the date of removal or placement, the conditions which led to the removal or placement of the child continue to exist and termination of parental rights would best serve the needs and welfare of the child.

\*　　\*　　\*

**(b) Other considerations.—**The court in terminating the rights of a parent shall give primary consideration to the developmental, physical and emotional needs and welfare of the child.  The rights of a parent shall not be terminated solely on the basis of environmental factors such as inadequate housing, furnishings, income, clothing and medical care if found to be beyond the control of the parent.  With respect to any petition filed pursuant to subsection (a)(1), (6) or (8), the court shall not consider any efforts by the parent to remedy the conditions described therein which are first initiated subsequent to the giving of notice of the filing of the petition.

23 Pa.C.S.A. § 2511(a)(8), (b).

It is well settled that a party seeking termination of a parent's rights bears the burden of proving the grounds to so do by "clear and convincing evidence," a standard which requires evidence that is "so clear, direct, weighty, and convincing as to enable the trier of fact to come to a clear conviction, without hesitance, of the truth of the precise facts in issue." *In re T.F.*, 847 A.2d 738, 742 (Pa. Super. 2004) (citation omitted).  Further,

[a] parent must utilize all available resources to preserve the parental relationship, and must exercise reasonable firmness in resisting obstacles placed in the path of maintaining the parent-child relationship.  Parental rights are not preserved by waiting for a more suitable or convenient time to perform one's parental

responsibilities while others provide the child with his or her physical and emotional needs.

*In the Interest of K.Z.S.*, 946 A.2d 753, 759 (Pa. Super. 2008) (citation omitted).

In order to terminate parental rights pursuant to 23 Pa.C.S.A. § 2511(a)(8), DHS must demonstrate: "(1) that the child has been removed from the care of the parent for at least twelve (12) months; (2) that the conditions which had led to the removal or placement of the child still exist; and (3) that termination of parental rights would best serve the needs and welfare of the child." *In re C.L.G.*, 956 A.2d 999, 1005 (Pa. Super. 2008) (citation omitted).

The Adoption Act provides that, a trial court "shall give primary consideration to the developmental, physical and emotional needs and welfare of the child." 23 Pa.C.S.A. § 2511(b). "The emotional needs and welfare of the child have been properly interpreted to include '[i]ntangibles such as love, comfort, security, and stability.'" *In re T.S.M.*, 71 A.3d 251, 267 (Pa. 2013) (citation omitted). The Act does not make specific reference to an evaluation of the bond between parent and child but our case law requires the evaluation of any such bond. *See In re E.M.*, 620 A.2d 481, 484 (Pa. 1993). However, this Court has held that the trial court is not required by statute or precedent to order a formal bonding evaluation performed by an expert. *See In re K.K.R.-S.*, 958 A.2d 529, 533 (Pa. Super. 2008).

Instantly, Mother's issues claim that the trial court abused its discretion when it permitted DHS to change Child's goal from reunification to adoption and terminated her parental rights.

In addressing the issue of a change of goal, this Court has said:

> By allowing [an agency] to change its goal to adoption, the trial court has decided that [the agency] has provided adequate services to the parent but that he/she is nonetheless incapable of caring for the child and that, therefore, adoption is now the favored disposition. . . .

*In the Matter of N.C.*, 909 A.2d 818, 824 (Pa. Super. 2006) (citation omitted).

The record before us demonstrates that DHS has provided services to Mother since July of 2015. In spite of DHS' efforts, however, the testimony of Dr. Russell, cited above, makes it clear that Mother is incapable of caring for Child independently and that a change of goal to adoption is now the favored disposition in this case. The trial court did not abuse its discretion when it changed Child's goal to adoption.

Child has been in placement in excess of twelve months. The trial court placed Child in DHS' care because Mother's mental state rendered her incapable of parenting Child and Mother lacked stable income and appropriate housing.

Dr. Russell stated his professional opinion that Mother lacked the capacity to provide safety and permanency because she lacked stability in every area of her life, and her history of debilitating mental health impaired

her insight and judgment. (*See* N.T. Hearing, at 72-73). Even with treatment and medication, Dr. Russell found Mother's mental illness "impacted her ability to function appropriately in day to day activities," precluding the capacity to parent or care for Child. (*Id.* at 73; *see id.* at 74-75). Ms. Flowers testified that Mother has failed to parent Child as a result of her inability to comprehend Child's medical conditions, failure to take her own medication, continuing hallucinations, lack of housing and her inability to earn and budget money, thereby posing a threat to Child's well-being. (*See id.* at 28-30, 39-40). Despite DHS' efforts, the conditions that led to Child's placement continue to exist more than twelve months after she entered DHS' care. The trial court did not abuse its discretion when it terminated Mother's parental rights pursuant to 23 Pa.C.S.A. § 2511(a)(8).

Child has lived in her pre-adoptive home since birth and is bonded completely with her foster mother, with whom she shares a loving relationship and a parent-child bond. The severance of Child's relationship with Mother will not cause Child irreparable harm, but the severance of Child's relationship with her foster mother will cause Child irreparable harm. (*See id.* at 41-43). The trial court did not abuse its discretion when it terminated Mother's parental pursuant to 23 Pa.C.S.A. § 2511(b).

Accordingly, for the reasons stated above, we affirm the decree of the Court of Common Pleas of Philadelphia County that terminated Mother's

parental rights pursuant to 23 Pa.C.S.A. § 2511(a)(8) and (b) and changed

Child's goal to adoption.

Decree affirmed.

Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary

Date: 9/11/18