J-S07001-24

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT O.P. 65.37**

| | | |
|---|---|---|
| IN THE INTEREST OF: T.W., A MINOR | : : : : | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| APPEAL OF: J.W., FATHER | : : : : : : : | |
| | : | No. 1615 MDA 2023 |

Appeal from the Order Entered October 25, 2023
In the Court of Common Pleas of York County Juvenile Division at No(s):
CP-67-DP-0000187-2023

BEFORE:   LAZARUS, P.J., KUNSELMAN, J., and COLINS, J.[*]

MEMORANDUM BY LAZARUS, P.J.:      **FILED: MARCH 22, 2024**

J.W. (Father) appeals from the order, entered in the Court of Common Pleas of York County, adjudicating his child, T.W. (Child) (born 1/2023), dependent, finding that Child was the victim of abuse, and concluding that Father and Child's caregiver, B.S., were perpetrators of the abuse.  ***See*** 42 Pa.C.S.A. § 6302; 23 Pa.C.S.A. §§ 6303, 6381(d).  After careful review, we affirm.

Father and Child's mother, K.P. (Mother), are separated; they share physical custody of Child.  B.S. is Father's former next-door neighbor, who Father had known for four to five years at the time of the alleged incident.

---

[*] Retired Senior Judge assigned to the Superior Court.

Father hired B.S. to watch Child and Father's other children, G.S. and K.W.,[1] when he was at work. On August 11, 2023, York County Children, Youth & Families (CYF) received a Child Protective Services (CPS) referral regarding Child, G.S. and K.W. The referral alleged that on August 10, 2023, Mother took Child to UPMC Hanover Hospital for medical treatment after Mother "observed [Child] to have a large bruise to the right cheek and an abrasion with bruising on the right side of the neck." Shelter Care Application, 8/11/23, at 3. Mother told hospital personnel that Child had been with Father for the past week, that Child "obtained the bruises and marks on her neck and cheek while in his custody," and that Mother did not know how Child sustained the injuries. *Id.*

Doctor Ashwini Sardana, the Hanover Hospital emergency room physician who examined Child on August 10th, described Child's injuries as a "[c]ontusion of other part of head [and an a]brasion of unspecified part of neck." UPMC Hanover Hospital Medical Report, 8/10/23, at 1. Although Doctor Sardana discharged Child as "stable" that evening, he told Mother that he was obligated to contact CYF to investigate the matter further. *See* N.T. Adjudication/Abuse Hearing, 10/25/23, at 27. Hanover Hospital's medical

---

[1] Father has two other minor children, K.W. (born 10/2021), Child's sister, and G.S. (born 1/2020), Child's half-sibling. There is no allegation that either G.S. or K.W. suffered child abuse. When asked if G.S. or K.W. could have caused Child's injuries, Dr. Lind testified that the injuries Child sustained "would require more force that a 2[-] or 3-year[-]old" could inflict. N.T. Adjudicatory/Abuse Hearing, 10/25/23, at 18-19.

records demonstrate that Dr. Sardana recommended Mother not return Child to Father's care that night. ***See*** UPMC Hanover Hospital Medical Report, 8/10/23, at 11. Mother, however, did return Child to Father's care that evening. ***See*** Hershey Medical Center Child Protection Team Inpatient Consultation Report, 8/11/23, at 3.

Following the filing of a Childline report on August 11, 2023, a CYF caseworker met with Father who told him that her supervisor had advised that Father take Child to Hershey Medical Center (HMC), as a result of which Father became "extremely upset[,] . . . took the [C]hild outside to his motor vehicle[,] and left the residence." ***Id.***; N.T. Adjudicatory/Abuse Hearing, 10/25/23, at 34, 41-43. Despite repeated requests from CYF, Father refused to take Child to the hospital or allow the caseworker to observe Child's sibling and half-sibling. ***See*** Hershey Medical Center Child Protection Team Inpatient Consultation Report, 8/11/23, at 4. The CYF caseworker testified that although Father ultimately apologized to her for overreacting and told her that he would take Child to HMC, Father explicitly said he did not want the caseworker to follow him to HMC and, after leaving for the hospital, Father decided not to take Child to HMC. ***See*** N.T. Adjudication/Abuse Hearing, 10/25/23, at 42-43.[2]

---

[2] Father testified, however, that after speaking to the CYF caseworker, he talked to a police officer and permitted the officer to see Child, G.S., and K.W., after which children were returned to Father's custody. ***See*** N.T. Adjudicatory/Abuse Hearing, 10/25/23, at 103-04.

Later that day, CYF caseworkers returned to Father's home with the police and placed Child, G.S., and K.W. into protective custody, *see* 23 Pa.C.S.A. § 6315, awarded temporary legal and physical custody of Child to CYF, and transported Child to HMC's Pediatric Emergency Room. *See* N.T. Adjudicatory/Abuse Hearing, 10/25/23, at 104 (Father testifying that later in the day on August 11th, the officer came back to Father's home and removed the children from Father's custody as per court order). At HMC, Child was examined by Dr. Marita E. Lind. *See* Hershey Medical Center Child Protection Team Inpatient Consultation Report, 8/11/23, at 4. There, medical personnel ruled out any underlying causes or conditions that would account for the bruising by conducting a skeletal survey and blood tests. Ultimately, Dr. Lind determined that Child had sustained unexplained "non-accidental trauma [in the form of] extensive facial bruising and bruising on her right anterior neck." HMC Child Protection Team Inpatient Consultation Report, 8/11/23, at 3.

"[P]arents [] reported the possibility that the dog or the seatbelt could have caused the injuries [to Child]." *Id.* However, HMC's medical staff did not find Mother's and Father's explanations consistent with Child's injuries. Rather, Dr. Lind opined that the injuries would have caused pain to Child when they were inflicted where they were caused by a "blow to the tissue . . . or multiple blows to the child's side of the face that would have been caused by something that was able to wrap around the child's curvature of [her] cheek and face." N.T. Adjudicatory/Abuse Hearing, 10/25/23, at 15, 17. Ultimately, Dr. Lind diagnosed Child's injuries as "physical abuse" and indicated a

- 4 -

"concern of failure to thrive." *Id.* *See In the Interest of A.C.*, 237 A.3d 553, 564 (Pa. Super. 2020) (clear and convincing evidence of child abuse where medial testimony revealed Child's injuries likely result of non-accidental trauma and injuries proven to be inconsistent with parent's explanation).

Following her discharge from HMC, on August 12, 2023, Child was placed in foster care along with G.S. and K.W. On August 14, 2023, CYF filed an emergency application requesting that Child remain in foster care "due to allegations and injuries suffered by [C]hild while in the custody of parents." *Id.* at 5. The court issued an emergency order of protective custody stating that Child was to remain in shelter care[3] because it was not in Child's best interest to remain with Mother or Father. *See* 42 Pa.C.S.A. § 6332. On August 15, 2023, CYF filed a dependency petition alleging Child was the victim of child abuse. *See* 23 Pa.C.S.A. § 6303.

On October 25, 2023, the court held a dependency/abuse hearing,[4] at which Dr. Lind, an expert in pediatrics and child abuse, Dr. Sardana, an expert in emergency medicine, Sarah White, a CYF caseworker, Valerie Acito, a PA Child visitation supervisor, and Father testified. At the conclusion of the hearing, the court adjudicated Child dependent for lack of proper parental care or control. *See* N.T. Dependency/Abuse Hearing, 10/25/23, at 128. The court

_____

[3] On August 25, 2023, the court granted CYF's petition to modify Child's placement and placed Child with Child's paternal aunt, a kinship resource.

[4] At the time of the hearing, Child and her sibling and half-sibling were living with maternal grandmother. N.T. Adjudicatory/Abuse Hearing, 10/25/23, at 49.

also found that CYF met its burden of proving that Child was the victim of child abuse where she had suffered serious injuries and pain, *id.* at 128-29; CYF had not been able to prove, by clear and convincing evidence, who perpetrated the abuse, *id.* at 129; under section 6381(d), Father and B.S. were presumed to be the perpetrators of the abuse, *id.* at 129-30; and Father did not rebut the section 6381(d) presumption where he "failed to establish that he had no reason to know that the party to whom he entrusted the care of [C]hild was a[] risk to [C]hild and that [Child] was not unsupervised during any period during which [C]hild suffered the injury in question." *Id.* at 130.

Father filed a timely appeal and court-ordered Pa.R.A.P. 1925(b) concise statement of errors complained of on appeal. On appeal, Father raises the following issue: "Did the trial court err as a matter of law and/or abuse[] its discretion in entering a finding of abuse against Father as outlined in 23 P[a].C.S.[A. §] 6303[,] as the *prima facie* presumption was rebutted as permitted under section 6381?" Appellant's Brief, at 4 (italics added).

We review this appeal for an abuse of discretion. ***In the Interest of L.Z.***, 111 A.3d 1164, 1174 (Pa. 2015). "The standard of review in dependency cases 'requires an appellate court to accept the findings of fact and credibility determinations of the trial court if they are supported by the record, but does not require the appellate court to accept the lower court's inferences or conclusions of law.'" *Id.* (citation and quotation marks omitted).

"[Although] dependency proceedings are governed by the Juvenile Act

(Act), . . . the C[hild] P[rotective] S[ervices] L[aw] [(CPSL)] . . . controls determinations regarding findings of child abuse, which the juvenile courts must find by clear and convincing evidence." *In re L.V.*, 209 A.3d 399, 417 (Pa. Super. 2019) (citations omitted); *see also In the Interest of X.P.*, 248 A.3d 1274, 1276 (Pa. Super. 2021) (same). The CPSL "does not provide for legal determinations of abuse; it is mainly a vehicle for reporting abuse and bringing quickly into play those services (including court hearings) available through county protective service facilities for the care of the child." *In the Interest of J.R.W.*, 631 A.2d 1019, 1022 (Pa. Super. 1993). "[T]he Act and the [CPSL] must be applied together in the resolution of child abuse complaints under the [CPSL and] reference must be made to the definition sections of both the [Act] and the [CPSL] to determine how that finding [of child abuse] is interrelated." *Id.* at 1023.

"'As part of [a] dependency adjudication, a court may find a parent [or caregiver] to be the perpetrator of child abuse[]' as defined by the . . . CPSL." *In re S.L.*, 202 A.3d 723, 728 (Pa. Super. 2019) (citation and quotations omitted). Section 6381(d) of the CPSL "provides for an 'attenuated' standard of evidence in making a legal determination as to the abuser in child abuse cases [where] a child has suffered serious physical injury . . . as would ordinarily not be sustained or exist except by reason of the acts or omissions of the parent or other person responsible for the welfare of the child." *J.R.W.*, *supra*, at 1023; 23 Pa.C.S.A. § 6381(d). *See L.Z.*, *supra* at 1184 (inclusion of word "omission" in section 6318(d) "encompasses situations where the

parent . . . is not present at the time of the injury[,] but is[,] nonetheless[,] responsible due to his or her failure to provide protection for the child").

Recently, the Pennsylvania Supreme Court reiterated the appropriate standard of proof for a finding of child abuse:

> The requisite standard of proof for a finding of child abuse pursuant to [s]ection 6303(b.1) of the CPSL is clear and convincing evidence. [A] petitioning party must demonstrate the existence of child abuse by the clear and convincing evidence standard applicable to most dependency determinations[.] 42 Pa.C.S.[A.] § 6341(c)[]. Clear and convincing evidence is "evidence that is so clear, direct, weighty, and convincing as to enable the trier of fact to come to a clear conviction, without hesitancy, of the truth of the precise facts in issue." [] [H]owever, in certain situations, the identity of the abuser need only be established through *prima facie* evidence. As an appellate court, we are required to accept the findings of fact and credibility determinations of the trial court, if they are supported by the record; however, [this C]ourt is] not bound by the lower court's inferences or conclusions of law.

*In the Interest of N.B.-A.*, 224 A.3d 661, 668 (Pa. 2020) (citations omitted).

Section 6381(d) of the CPSL establishes a rebuttable evidentiary presumption when a child sustains abuse not ordinarily suffered absent acts or omissions of a parent or other responsible party. Under such circumstances, "the fact of abuse suffices to establish *prima facie* evidence of abuse by the parent or person responsible." *L.Z.*, *supra* at 1167.[5] *See id.*

---

[5] Section 6381(d) provides:

> (d) *Prima facie* evidence of abuse. — Evidence that a child has suffered child abuse of such a nature as would ordinarily not be sustained or exist except by reason of the acts or omissions of the

*(Footnote Continued Next Page)*

at 1184 ("The Legislature [] carved out a very limited exception to these more stringent evidentiary standards, allowing for the possibility of identifying the perpetrator of abuse based on *prima facie* evidence in cases where the abuse is "'of such a nature as would ordinarily not be sustained or exist except by reason of the acts or omissions of the parent[.]'") (citation omitted).

Under section 6381(d), a parent or other responsible caregiver may rebut the *prima facie* presumption with evidence:

> [d]emonstrating that the parent or responsible person did not inflict the abuse, potentially by testifying that they gave responsibility for the child to another person about whom they had no reason to fear or perhaps that the injuries were accidental rather than abusive. The evaluation of the validity of the presumption would then rest with the trial court evaluating the credibility of the *prima facie* evidence presented by . . . [DHS] . . . and the rebuttal of the parent or responsible person.

*Id.* at 1185. **See id.** at 1176 n.15 (section 6381(d) presumption may be rebutted with evidence that parent or responsible person was absent at time of injury and not otherwise responsible for injury by failing to secure proper care for child); **see also In re S.L.**, 202 A.3d 723, 728 (Pa. Super. 2019) (section 6381(d) presumption "can be rebutted, like other statutory presumptions, with countervailing competent, substantial evidence") (citations omitted).

---

> parent or other person responsible for the welfare of the child shall be *prima facie* evidence of child abuse by the parent or other person responsible for the welfare of the child.

23 Pa.C.S.A. § 6381(d).

Instantly, Father contends that the trial court erred finding that he failed to rebut section 6381(d)'s presumption that he was a perpetrator of abuse where "at no point was [he] alone with [C]hild . . . throughout the entirety of the time involved." Appellant's Brief, at 15. Rather, Father asserts that the evidence showed that "the injury was **probably** caused by a baby[]sitter that Father had no reason to know would do such a thing." *Id.* (emphasis added).

In order to rebut the section 6381(d) *prima facie* presumption, a parent or caregiver must provide evidence "[d]emonstrating that [he] did not inflict the abuse . . . [by] testifying that [he] gave responsibility for [C]hild to [another person] . . . about whom [he] had no reason to fear" or that the injuries were accidental rather than abusive. *L.Z.*, *supra* at 1185. *See In re S.L.*, 202 A.3d 723 (Pa. Super. 2019) (finding of *prima facie* evidence against parent pursuant to section 6831(d) "does not end the analysis;" due process dictates parent entitled to present rebuttal evidence).

Here the trial court concluded that, based upon medical evidence, the injuries Child sustained were not accidental and occurred while "in the care of several people during [F]ather's exercise of his physical custody of [C]hild." N.T. Adjudicatory/Abuse Hearing, 10/25/23, at 130; *id.* at 12 (Doctor Lind testifying she conducted physical examination of Child on August 11, 2023, and discovered "extensive bruising to the right side of her face from lateral to her mouth extending to just before her ear, [and also] had some small abrasions in her ear [and a] linear irregular bruise on the right side of her neck"). Moreover, the court did not find that Father rebutted the section

6381(d) presumption where Father's testimony confirmed that, at all relevant times during the period when Child suffered her injuries, Child was supervised by an adult and Father had concerns regarding B.S.'s childcare abilities. **See** N.T. Abuse Hearing, /23, at 130-31; **see also** Trial Court Order, 10/25/23, at 5. It is well-established that once a parent or caregiver presents rebuttal evidence, "[t]he evaluation of the validity of the presumption would then rest with the trial court evaluating the credibility of the *prima facie* evidence presented by CY[F] and the rebuttal of the parent or responsible person." **L.Z.**, 111 A.3d at 1185.

The fact that there were other individuals caring for Child during the period when she sustained her injuries or that Father may not have been alone with Child during that time period does not relieve Father of his parental responsibility while Child is in his custody. **See In the Interest of C.B.**, 264 A.3d 761, 777 (Pa. Super. 2021) (en banc); **see also L.Z.**, **supra** at 1185 ("When a child is in the care of multiple parents or other persons responsible for care, those individuals are accountable for the care and protection of the child whether they actually inflicted the injury or failed in their duty to protect the child."). **See also** N.T. Dependency/Abuse Hearing, 10/25/23, at 113 (Father testifying child sustained injury while in his care, but "nobody has any information or has provided [Father with information] about how she got the [facial] bruising"). As our Supreme Court recognized in **N.B.-A.**, **supra**, at 668, when a child sustains abuse not ordinarily suffered absent acts or omissions of a parent or other responsible party, the identity of the abuser

- 11 -

need only be established through *prima facie* evidence. **See also L.Z.**, **supra** at 1167 (under such circumstances, "the fact of abuse suffices to establish *prima facie* evidence of abuse by the parent or person responsible").

Father, himself, testified that he had an altercation with B.S. after B.S. failed to change Child's dirty diaper on Wednesday, August 9th, causing Child to suffer a diaper rash.[6] **See** N.T. Dependency/Abuse Hearing, 10/25/23, at 93, 95. Father used "vulgar language [and] intimidate[d]" B.S. during the incident. **See also id.** (Father testifying, day before bruising to Child's right cheek appeared, "[he] was in [B.S.'s] face" upon finding Child and Father's other children had full diapers); **id.** at 94 (Father testifying his girlfriend told Father "he needed to calm down" before he went back downstairs to talk to B.S.). Father also testified that the situation "just d[idn't] make sense" when B.S. kept telling Father that "he [had] just changed [Child's diaper] 10 or 15 minutes before [Father] came home." **Id.** at 95. However, Father still permitted B.S. to come to his house to care for Child on Thursday, August 10th, and that "[B.S.] might have . . . c[o]me to the house [on Friday, August 11th] on his own to help with the children because [Father's girlfriend] is pregnant." **See id.** at 107, 109. Father also testified that he had known B.S., a former neighbor, for four to five years, that B.S. was "not some random dude he picked up off the street," and that he "trusted him because he thought he knew him." **Id.** at 108. **See also id.** at 109-10 (Father testifying after he

---

[6] Father's other children also suffered from dirty diapers when Father returned home from work on August 9th.

angrily confronted B.S. on August 9th, he "gave [B.S.] the benefit of the doubt [because] people ma[ke] mistakes").

Father testified that throughout the night of August 9th, he was up multiple times with Child due to her being "more fussy than she normally is." *Id.* at 96. When Father left for work around 5:00 AM on the morning of August 10th, he did not see any injuries on Child.[7] *Id.* at 98. However, when Father's girlfriend awoke that later morning, she noticed bruises on the right side of Child's face, *id.* at 99,[8] and immediately called Father at work. *Id.* Father's girlfriend "describe[d Child's] bruises [to him]," but denied that Child was fussy, crying, or appeared to be in pain. *Id.* Father told his girlfriend to "wait until [he] came home and [then he would] check on [Child] and see what [his] parental opinion [is.]" *Id.* When Father arrived home from work on August 10th, he "freaked out" when he saw Child's face, *id.* at 100, prompting him to "immediately tr[y to] call [Mother] . . . because she has the insurance information." *Id.* Mother and Maternal Grandmother then took Child to the hospital and, after she was seen by medical staff and discharged, returned Child to Father's residence. *Id.* at 99-100.

Father testified that, on Friday, August 11th, he went to work around 5:00 AM and left Child in the care of his girlfriend, B.S., and B.S.'s girlfriend.

_____

[7] However, on cross-examination, Father testified that "it was dark [at] 4:30 or 5:00 in the morning." *Id.* at 110.

[8] On direct examination, CYF caseworker Sarah White testified that B.S. told her he first noticed the bruise on Child's face and told Father's girlfriend, who then called Father. *See* N.T. Adjudicatory/Abuse Hearing, 10/25/23, at 39.

*Id.* at 101. Father further testified that after he returned home from work that day around 4:00 PM, *id.*, a CYF caseworker visited him and told him he should take Child to HMC. *Id.* Father did not take Child to HMC, but testified that after he talked to the CYF caseworker, he talked to a police officer who came to Father's residence, looked at Child, and returned Child to Father's care. *Id.* at 102-03. Finally, Father testified that he was never alone with Child during the time that she sustained the non-accidental injuries. *Id.* at 105 (Father stating he was never alone with Child from Wednesday, August 9, 2023 through Friday, August 11, 2023).

Applying section 6381(d) to the instant case, we affirm the trial court's determination that Father was a perpetrator of abuse to Child. First, the medical evidence presented by Dr. Lind demonstrated that Child's injuries were neither accidental nor self-inflicted. Second, at the time she sustained her injuries, Child was being cared for by Father, Father's girlfriend, and B.S. Third, Child's injuries were shown to be "of such a nature as would ordinarily not be sustained or exist except by reason of the acts or omissions of the parent or other person responsible for the welfare of [C]hild." 23 Pa.C.S.A. § 6381(d). Therefore, either Father, Father's girlfriend, B.S., or any combination of the three inflicted the abuse or failed to protect Child from the other's abuse.

Child's guardian *ad litem* (GAL), Kristina E. Forrey, Esquire, has taken the position on appeal that the trial court "inadvertently made an error and incorrectly determined that the presumption was not rebutted under [section]

6381(d)." Brief of Guardian *Ad Litem*, at 6. Specifically, the GAL contends that "specific statements the [t]rial [c]ourt made at the time of trial which do not appear to align with the facts presented, and statements presented by witnesses for the Agency[,] weakened the Agency's case." Brief of Guardian *Ad Litem*, at 20.

The GAL takes issue with the fact that the trial court afforded Father's girlfriend leniency in the matter because "she was cooperative with the investigation." *Id.* at 33. Although Father may have been somewhat cooperative, the fact remains that Child was Father's legal responsibility, as her parent, during the time she was in his custodial care. In addition, Father first overreacted to and then outright defied a CYF caseworker who told Father that he should take Child to HMC to be evaluated after her CYF supervisor saw photographs of Child's injuries. *See* N.T. Adjudicatory/Abuse Hearing, 10/25/23, at 34, 41-43.

The GAL also directly attacks the trial court's credibility determination regarding Father's rebuttal evidence. Specifically, she contends that where Father "presented uncontroverted testimony that he had known [B.S.] for five years and had never had any indication that [B.S.] was capable of harming any child," Brief of Guardian *Ad Litem*, at 29, "Father had no cause for concern regarding [B.S.'s] care of the children until August 9, 2023[.]" *Id.* (emphasis added). Thus, she asserts that CYF presented no evidence that "Father knew or should have known that [B.S.] would harm a child." *Id.*

As we have previously stated, a trial court is tasked with the responsibility of evaluating not only the credibility of the *prima facie* evidence presented by the agency, but also any rebuttal evidence presented by a parent or caretaker. ***See L.Z.***, 111 A.3d at 1185. Here, as the GAL acknowledges, Father did have cause for concern regarding B.S.'s care of Child on August 9th. In fact, Father was livid when he noticed that Child, who had been in B.S.'s care, had a diaper that was so full that it had caused a rash. ***See*** N.T. Adjudicatory/Abuse Hearing, 10/25/23, at 93-94 (Father's girlfriend telling Father he had "to calm down" and Father having to talk to girlfriend for five to ten minutes in order to calm down enough to be able to go downstairs and talk to B.S. civilly). Based on this evidence, we find it was not an abuse of discretion for the trial court to conclude that Father was not credible when he testified that he had no reason to fear giving B.S. the responsibility of caring for Child. ***See In re S.G.***, 922 A.2d 943, 947 (Pa. Super. 2007) (trial court, not appellate court, is charged with responsibilities of evaluating credibility of witnesses and resolving any conflicts in testimony; when trial court's findings are supported by competent evidence of record, we will affirm even if record could also support opposite result); ***see also L.Z.***, ***supra*** at 1176 n.15. ("the presumption of [s]ection 6381(d) may be rebutted with evidence that the parent or responsible person was absent at the time of the injury and not otherwise responsible for the injury **by failing to secure proper care for the child**") (emphasis added).

On a related note, the GAL argues that the trial court "misunderstood the timeline" and that "Child was most likely injured on August 9, 2023," before Father had the argument with B.S. about Child's dirty diaper. Brief of Guardian *Ad Litem*, at 32. While the record bears out that Mother told medical providers at Hanover Hospital, on August 10th, that Father's girlfriend noticed Child had a small red mark on her cheek[9] on August 9th,[10] the non-accidental injuries determined to be indicative of child abuse consisted of extensive facial bruising and bruising on Child's right anterior neck, which were diagnosed on August 11, 2023, by HMC staff, and determined to have occurred sometime on August 10th—after Father's altercation with B.S.

Accordingly, we conclude that the trial court's factual findings and credibility determinations are supported by the record. **L.Z.**, **supra**.[11] *Prima*

_____

[9] CYF caseworker Sarah White testified that B.S. told her that on the 9th he noticed Child had a red mark on her cheek when she woke up from her nap. N.T. Adjudication/Abuse Hearing, 10/25/23, at 38.

[10] Notably, the medical providers at Hanover Hospital did not conclude child's injuries were the result of abuse. **See L.Z.**, **supra** at 1185 ("child abuse cases often involve a child presenting to a hospital with significant injuries that are entirely consistent with common types of child abuse and entirely inconsistent with the implausible explanations concocted by the parents and responsible persons to avoid allegations of child abuse"). Rather, the hospital's patient care report indicates the following: Abuse Indicators – Screening – Safe in Home: Other (Comment) – CYS to follow up on suspicious injury report made." UPMC Hanover Hospital Medical Report, 8/10/23, at 25.

[11] As noted, the trial court, not the GAL, makes credibility determinations in the instant matter as the trier-of-fact. Therefore, while we have addressed the GAL's concerns as denoted in her Appellee's Brief, because the trial court's determinations are supported by the record, we affirm its conclusion that Father did not rebut the section 6381(d) presumption.

*facie* evidence exists to apply section 6381(d)'s presumption that Father was a perpetrator of Child's abuse where Child was in Father's custody when she sustained her non-accidental injuries that would not normally have been sustained without either actions or omissions of a parent or childcare provider. *See* 23 Pa.C.S.A. § 6381(d). Moreover, we find that Father failed to rebut the presumption, with substantial countervailing evidence, *L.Z.*, *supra*, where Child's injuries were medically determined to be non-accidental and not self-inflicted, Father had custody of Child at the time she was injured, and Father had reason to question his decision to leave Child in B.S.'s care. *Id.* at 1186.[12]

Order affirmed.

Judgment Entered.

Benjamin D. Kohler, Esq.
Prothonotary

Date: 3/22/2024

---

[12] Moreover, one cannot discount the possibility that Child was injured sometime during the early morning hours of August 10th before Father left for work. As discussed *supra* at n.7, on cross-examination, Father testified that "it was dark [at] 4:30 or 5:00 in the morning [on August 10[th]]." N.T. Adjudicatory/Abuse Hearing, 10/25/23, at 110. Therefore, Father's testimony on direct examination, that he did not see any injuries on Child when he left for work on August 10th, is somewhat contradicted by his testimony on cross-examination.