J-A15030-20
J-A15031-20

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37**

| | | |
|---|---|---|
| IN THE INTEREST OF: C.B., A MINOR | : | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| | : | |
| | : | |
| | : | |
| APPEAL OF: A.B., FATHER | : | |
| | : | |
| | : | |
| | : | |
| | : | |
| | : | No. 121 EDA 2020 |

Appeal from the Order Entered December 16, 2019
In the Court of Common Pleas of Philadelphia County Juvenile Division at
No(s): CP-51-DP-0001613-2019

\*\*\*\*\*

| | | |
|---|---|---|
| IN THE INTEREST OF: K.B., A MINOR | : | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| | : | |
| | : | |
| | : | |
| APPEAL OF: A.B., FATHER | : | |
| | : | |
| | : | |
| | : | |
| | : | |
| | : | No. 127 EDA 2020 |

Appeal from the Order Entered December 16, 2019
In the Court of Common Pleas of Philadelphia County Juvenile Division at
No(s): CP-51-DP-0001614-2019

\*\*\*\*\*

| | | |
|---|---|---|
| IN THE INTEREST OF: A.B., A MINOR | : | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| | : | |
| | : | |
| | : | |
| APPEAL OF: A.B., FATHER | : | |
| | : | |
| | : | |
| | : | |
| | : | No. 129 EDA 2020 |

J-A15030-20
J-A15031-20

Appeal from the Order Entered December 16, 2019
In the Court of Common Pleas of Philadelphia County Juvenile Division at
No(s):  CP-51-DP-0001615-2019

*****

| | | |
|---|---|---|
| IN THE INTEREST OF: C.B., A MINOR | : | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| | : | |
| | : | |
| | : | |
| APPEAL OF: S.B., MOTHER | : | |
| | : | |
| | : | |
| | : | |
| | : | |
| | : | No. 124 EDA 2020 |

Appeal from the Order Entered December 16, 2019
In the Court of Common Pleas of Philadelphia County Juvenile Division at
No(s):  CP-51-DP-0001613-2019

*****

| | | |
|---|---|---|
| IN THE INTEREST OF: K.B., A MINOR | : | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| | : | |
| | : | |
| | : | |
| APPEAL OF: S.B., MOTHER | : | |
| | : | |
| | : | |
| | : | |
| | : | |
| | : | No. 125 EDA 2020 |

Appeal from the Order Entered December 16, 2019
In the Court of Common Pleas of Philadelphia County Juvenile Division at
No(s):  CP-51-DP-0001614-2019

*****

| | | |
|---|---|---|
| IN THE INTEREST OF: A.B., A MINOR | : | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| | : | |
| | : | |
| | : | |
| APPEAL OF: S.B., MOTHER | : | |
| | : | |
| | : | |

- 2 -

:
: No. 128 EDA 2020

Appeal from the Order Entered December 16, 2019
In the Court of Common Pleas of Philadelphia County Juvenile Division at
No(s): CP-51-DP-0001615-2019

*****

IN THE INTEREST OF: Y.C., A MINOR :   IN THE SUPERIOR COURT OF
:         PENNSYLVANIA
:
APPEAL OF: S.B., MOTHER          :
:
:
:
:
:
: No. 130 EDA 2020

Appeal from the Order Entered December 16, 2019
In the Court of Common Pleas of Philadelphia County Juvenile Division at
No(s): CP-51-DP-0001612-2019

BEFORE:   LAZARUS, J., KING, J., and STRASSBURGER, J.[*]

MEMORANDUM BY LAZARUS, J.:          **FILED SEPTEMBER 02, 2020**

A.B. (Father) appeals from the trial court's orders adjudicating his three minor children, C.B. (born 1/16), and twins, K.B. and A.B. (born 5/19), dependent.  S.B. (Mother) also appeals from the same orders adjudicating those minor children dependent, as well as an order adjudicating her other

_____

[*] Retired Senior Judge assigned to the Superior Court.

- 3 -

child, Y.C.[1] (born 9/10), dependent.[2]  The court also made a finding of child abuse as to Father and Mother (collectively, Parents).  Here, medical testimony established that five-month-old K.B.'s injuries:  were the result of non-accidental trauma; occurred while Father and Mother were responsible for K.B.'s welfare; and neither Father nor Mother could provide an explanation of how the injuries occurred.  Under these facts, the court was required to apply the evidentiary presumption found in 23 Pa.C.S. § 6381(d), which establishes a *prima facie* case of abuse by the persons who were responsible for the child when the abuse occurred.  Because Mother and Father failed to rebut that presumption, we are constrained to affirm the orders.

Father and Mother are the biological parents of C.B., K.B. and A.B. Mother also has a child, Y.C., whose biological father has passed away.  Father and Y.C. have a close, father-son type relationship.  Since Mother and Father both work outside the home, they hired two babysitters (Babysitter #1 & Babysitter #2)[3] to take care of Children when they are at work.  Y.C.'s paternal grandmother (Paternal Grandmother) also helps care for Children.

---

[1] We will refer to all four children, collectively, as "Children."

[2] We have *sua sponte* consolidated Father's and Mother's appeals as the orders appealed and questions involved are the same.  **See** Pa.R.A.P. 513 (consolidation of multiple appeals).

[3] Babysitter #1 took care of the twins, K.B. and A.B., while Babysitter #2 took care of Y.C. and C.B.

- 4 -

K.B. and A.B. attended the Goddard School in October 2019. On the evening of October 11, 2019, Mother and Father had dinner at the Palm Restaurant in Philadelphia, while K.B. and A.B. were cared for by Babysitter #1. When Mother and Father returned home from dinner at approximately 11:30 p.m., Children were asleep. The next morning, a Saturday, Mother and Father left the house early to go shopping for winter coats in Delaware for the Children; Children stayed with Babysitter #1 and Babysitter #2 while they were gone. Mother and Father returned home from shopping around 5:30 p.m., at which time Babysitter #1 went to her home for a brief period and then returned to Parents' home around 8:00 p.m. where she resumed her babysitting duties and stayed the night.[4] The following day, Y.C. and C.B. went to a pumpkin patch with Babysitter #2, while Babysitter #1 watched the twins at home when Mother and Father went to New York for the day. Mother testified that she received a picture of the twins in their car seats from Babysitter #1 at 4:30 p.m. on the 13th and that there did not appear to be anything wrong with K.B. at that time. Neither babysitter noticed anything amiss with Children that day, except that K.B. fell asleep on his right side which was unusual as he always slept on his back. When K.B. woke up that evening before Parents returned home from New York City, Babysitter #2

---

[4] Mother testified that Babysitter #1 stays overnight on Fridays and Saturdays to help with the twins.

testified that his cry was not normal and sounded like "a grunt cry, almost as if he w[ere] hurt." N.T. Dependency/Abuse Hearing, 12/16/19, at 146-48. Paternal Grandmother,[5] Babysitter #1, and Babysitter #2 were at the house when Mother and Father returned home from New York around 10:10 p.m. Babysitter #1 left to go home about 10 minutes after Mother and Father returned home. Although K.B. was fussy that evening, it did not concern Mother or Father since he was the more difficult of the twins.

Early on the morning[6] of October 14, 2019, K.B. let out a loud "scream" that woke up Parents. N.T. Dependency/Abuse Hearing, 12/16/19, at 72. Father found K.B. in distress; Mother noticed that when K.B.'s hand was touched he would scream. Paternal Grandmother noticed that K.B. had swelling on his right arm and hand on the morning of the 14th as well. That morning, around 8:00 a.m., Mother and Father took K.B. to Virtua Hospital (Virtua) in Voorhees, NJ, to be evaluated. Virtua is approximately a one-hour drive from Parents' home. A series of radiographs known as a "skeletal survey" showed that K.B. had a broken bone in his upper right arm and a right shoulder fracture; because there were no signs of healing, an examining doctor determined that the injuries had been sustained no earlier than seven

---

[5] Paternal Grandmother stays overnight on Sundays and sleeps on the same floor of the home as the twins.

[6] Father's testimony was inconsistent with regard to the time he discovered K.B. was injured. While he stated K.B. screamed and woke him up around 3:00 a.m. on the morning of the 14th, he also testified that he did not realize K.B.'s arm was injured until 6:30-7:00 a.m. when he went in to see him that morning.

to ten days prior to the imaging. Mother and Father indicated that they had no idea how the Child sustained these injuries. In the 24 hours preceding the discovery of the injuries, K.B had been in the care of three individuals in addition to Mother and Father: Paternal Grandmother, Babysitter #1, and Babysitter #2.

K.B. was transferred from Virtua to the emergency department of the Children's Hospital of Philadelphia (CHOP). At CHOP, Dr. Brian William Brennan, M.D., a child abuse and maltreatment fellow, evaluated K.B. for suspected child abuse. Doctor Brennan testified that after evaluating K.B., he concluded that he had no skeletal abnormalities and discovered nothing in K.B.'s medical history or lab work that would lead him to believe that K.B.'s bones were more susceptible to breaking or that he suffered from any kind of nutritional deficiency or metabolic disorder. *See* N.T. Dependency/Abuse Hearing, 11/8/19, at 28. According to the additional imaging done at CHOP, Dr. Brennan was able to discern, to a reasonable degree of medical certainty, that there were no signs of healing in either of K.B.'s two fractures, which suggested that the fractures were fresh and had occurred sometime within 7-10 days prior[7] to the imaging. CHOP doctors determined that the injuries

---

[7] K.B.'s Goddard School records revealed that he was asymptomatic on Friday, October 11th. N.T. Dependency/Abuse Hearing, 11/8/19, at 12. Thus, CPS narrowed the injury time frame to sometime after school on the 11th and the early morning of Monday the 14th. *Id.*

were caused by some sort of non-accidental trauma, and that the fractures were highly specific for an abusive or inflicted type of injury.

Social workers from the Philadelphia Department of Human Services (DHS) spoke to the family at CHOP, after receiving a report alleging five-month-old K.B. had arrived at CHOP with unexplained injuries to his arm and shoulder. Mother and Father were both questioned by police about K.B.'s injuries; neither parent knew how he sustained the injuries. Parents also did not report anything negative about K.B.'s caregivers to DHS or authorities. Mother, Father, Babysitter #1, Babysitter #2, and Paternal Grandmother were initially listed as potential perpetrators of abuse on DHS' child abuse report (Report). DHS social worker Krista Gilmore, who investigated the Report, determined that K.B. was likely injured between late Sunday night on the 13th and Monday morning on the 14th "[b]ased on the interviews,[8] based on the medical evidence, and based on the fact that everyone said that [K.B.] was fine until Monday morning." N.T. Dependency/Abuse Hearing, 12/16/19, at 86- 87. While Gilmore concluded that Father and Mother are well bonded with Children and are capable of meeting their needs and keeping them safe,[9] she

_____

[8] Gilmore testified that she interviewed Mother, Father, Babysitter #1, Babysitter #2, and Paternal Grandmother.

[9] In fact, there is no evidence on record that K.B. had any prior fractures or healed injuries to suspect that he had been abused in the past. *Cf. In re A.H.*, 763 A.2d 873 (Pa. Super. 2000) (where child's treating doctor found healed fracture of child's left radius, which was inflicted approximately one to two months prior to current abuse examination, and fracture of upper humerus of left arm, which was inflicted within two to four weeks prior to exam).

ultimately determined that the report was indicated with regard to Mother, Father and Paternal Grandmother.  Specifically, Gilmore noted that these three individuals should be held responsible for K.B.'s injuries because "she could not place them outside of the location at the time frame . . . that [DHS] had." *Id.* at 80, 120.

Children were taken into protective custody on October 16, 2019.  A shelter care hearing took place on October 17, 2019, after which Children were ordered to remain in DHS' custody.  At the time of the hearing, Y.C., C.B. and A.B. had been placed with Father's mother.  When K.B. was released from CHOP, he also remained in Father's mother's care.  DHS filed dependency petitions on October 21, 2019, alleging Children were "dependent and/or abused pursuant to the Juvenile Act[, (Act)] 42 Pa.C.S. § 6302 (Dependent Child [who is without proper care or control]) and/or the Child Protective Services Law [(CPSL),] 23 Pa.C.S. § 6303(b[.]1) [(defining "Child abuse")]. On November 6, 2019, the Child Advocate[10] filed a motion for a finding of child abuse as to Mother and Father with regard to K.B.  **See** 23 Pa.C.S. § 6303(b.1).  On November 8, 2019 and December 16, 2019, the court held a consolidated, two-day hearing on the dependency petitions and motion for

_____

[10] On October 16, 2019, the court appointed counsel and a guardian *ad litem* for K.B.  At the dependency/abuse hearings, child advocate, Sarah Henschke, Esquire, and her supervising attorney and co-counsel, Beth Kahn, Esquire, represented Children.

finding of child abuse. At the hearings Dr. Brennan, Ms. Gilmore, Babysitter #2, Mother and Father testified.

On December 16, 2019, the court granted the motion for a finding of child abuse with regard to Mother and Father, and ordered Parents to complete parenting capacity evaluations and referred them to Family School. The court found that the testimony narrowed down the timeframe of when K.B. sustained his injuries to between Sunday (October 13th) evening to Monday (October 14th) morning. N.T. Dependency/Abuse Hearing, 12/16/19, at 181. Notably, the court pointed out that when Babysitter #2 returned home with the other children around 7:30 p.m. on the 13th, she observed K.B. sleeping on his right side and "if he's sleeping on his right side, he could not have been hurt at that time[.]" *Id.* Mother also testified that when she and Father returned home from New York City at 10 p.m. on the 13th, K.B. "was turned on his right side in his Boppy[11]." *Id.* at 46.

While the court ultimately concluded that neither Mother nor Father intentionally or knowingly abused K.B., it did find that a recklessness standard was met since parental duties also extend to protecting children from harm that others may inflict. On the same date, the trial court entered four orders of adjudication and disposition for each child. With regard to K.B. and A.B., the court found that clear and convincing evidence existed to declare them

---

[11] A "Boppy" is a horseshoe-shaped, ergonomic pillow that caretakers use for supporting and feeding infants and babies. *See* https://www.boppy.com/pages/time-line.

dependent and removed them from Parents' home "based upon the findings of abuse, neglect or dependency[,]. . . that it is in the best interest of [] Child[ren] to be removed from the home, that to allow [] Child[ren] to remain in the home would be contrary to [] Child[ren]'s welfare, and that [DHS] made [r]easonable [e]fforts to prevent or eliminate the need for removal of [] Child[ren] from the home." K.B. Order, 12/16/19, at 1-2; A.B. Order, 12/16/19, at 1-2. K.B. and A.B. were placed in kinship care with Father's mother, legal custody of K.B. and A.B. was transferred to DHS, and Parents were given twice weekly, line-of-sight and line-of-hearing visits at Father's mother's home. The court also permitted visits to be "modified by agreement of the parties." *Id.* at 2. The placement goal for both K.B. and A.B. remained "return to parent or guardian." *Id.* Finally, parents were referred to "Family School" and a parenting capacity evaluation, were ordered to maintain contact with CUA and attend all of K.B.'s medical and dental appointments. *Id.*

With regard to C.B. and Y.C., the court found by clear and convincing evidence that they were "without proper care, or control, subsistence, [or] education as required by law, or other care necessary for [their] physical, mental, or emotional health, or morals." C.B. Order, 12/16/19, at 1; Y.C. Order, 12/16/19, at 1. The court, however, determined that it would not be contrary to C.B.'s and Y.C.'s welfare to permit them to remain in the family home where "[C]hild[ren are] safe in the current placement setting." *Id.* at 1-2. Legal custody of C.B. and Y.C. remained with Parents.

- 11 -

Father filed three timely notices of appeal from the dependency orders and abuse order, as well as a court-ordered Pa.R.A.P. 1925(b) concise statement of errors complained of on appeal. Mother filed four timely notices of appeal from the dependency orders and abuse order, as well as a court-ordered Rule 1925(b) concise statement of errors complained of on appeal.[12] On appeal, Father presents the following issues for our consideration:

(1)     Whether the trial court erred as a matter of law and abused its discretion where it determined that [Father] was a perpetrator of child abuse against K.B.

(2)     Whether the trial court erred as a matter of law where it determined that [Children] met the definition of dependent children.

(3)     Whether the trial court erred as a matter of law and abused its discretion when it ordered that it was clearly necessary to remove K.B. and A.B. from their parents' care.

Father's Brief, at 3. Mother presents the following issues on appeal:

(1)     Whether the trial court erred as a matter of law and abused its discretion where it determined that [Mother] was a perpetrator of child abuse against K.B.

(2)     Whether the trial court erred as a matter of law where it determined that [Children] met the definition of dependent children.

_____

[12] On January 5, 2020, three days after they filed their notices of appeal, Mother and Father each filed motions for reconsideration of the court's dependency orders and abuse order. However, it appears that the court did not rule on the motions. *See Cheatem v. Temple Univ. Hosp*., 743 A.2d 518, 520 (Pa. Super. 1999) (filing of motion for reconsideration does not toll thirty-day appeal period, unless trial court enters order expressly granting reconsideration within thirty days of entry of appealable order).

(3)   Whether the trial court erred as a matter of law and abused its discretion when it ordered that it was clearly necessary to remove K.B. and A.B. from their parents' care.

Mother's Brief, at 3.

Father's and Mother's first issues allege that the trial court committed error when it determined that they were perpetrators of abuse with regard to K.B.  Specifically, they contend that their conduct did not meet the legal standard for a perpetrator by omission, that there is no evidence of record to support the conclusions that their conduct was reckless, and that applying the presumption under section 6381(d) of the CPSL was in error.[13]  Father's Brief, at 19; Mother's Brief, at 19.

In *In the Interest of N.B.-A.*, 224 A.3d 661 (Pa. 2020), the Pennsylvania Supreme Court recently reiterated the appropriate standard of proof for a finding of child abuse:

---

[13] To the extent that Father and Mother argue that Appellee waived application of a section 6318(d) presumption because it did not cite to the statute in its motion for finding of child abuse, we disagree.  First, we note that Father and Mother failed to raise this specific issue of waiver in their Rule 1925(b) statements of errors complained of on appeal.  *See* Pa.R.A.P. 1925(b)(4)(vii). Second, both counsel for Father and counsel for Mother discussed the presumption and the right to present rebuttal evidence at the dependency/abuse hearings.  N.T. Dependency/Abuse Hearing, 12/16/19, at 52, 161-62.  Thus, the argument is waived.   However, even if they had not waived the issue, we note that there is no statutory requirement that the presumption be pled in a motion or petition.  The presumption is found in a miscellaneous provision under the CPSL that sets forth additional rules of evidence (here, a *prima facie* evidence of abuse) that govern in child abuse proceedings in court or in any department administrative hearing.  *See* 23 Pa.C.S. § 6381; *see also infra* at 15.

The requisite standard of proof for a finding of child abuse pursuant to [s]ection 6303(b.1) of the CPSL is clear and convincing evidence. [A] petitioning party must demonstrate the existence of child abuse by the clear and convincing evidence standard applicable to most dependency determinations, 42 Pa.C.S. § 6341(c)[]. Clear and convincing evidence is "evidence that is so clear, direct, weighty, and convincing as to enable the trier of fact to come to a clear conviction, without hesitancy, of the truth of the precise facts in issue." [] **However, in certain situations, the identity of the abuser need only be established through *prima facie*[14] evidence.** As an appellate court, we are required to accept the findings of fact and credibility determinations of the trial court, if they are supported by the record; however, th[is] [C]ourt is not bound by the lower court's inferences or conclusions of law.

*Id.* at 668 (citations omitted) (emphasis added). An individual may be held responsible for child abuse by either acts or omission. *In re: L.V.*, 127 A.3d 831, 838 (Pa. Super. 2015).

Instantly, the trial court deemed Father and Mother perpetrators of child abuse, as defined in section 6303(b.1)(1)[15] of the CPSL. The court further

---

[14] *Prima facie* evidence is "[s]uch evidence as, in the judgment of the law, is sufficient to establish a given fact, or the group or chain of facts constituting the party's claim or defense, and which if not rebutted or contradicted, will remain sufficient." *In the Interest of L.Z.*, 111 A.3d 1164, 1184 (Pa. 2015), citing Black's Law Dictionary 825 (6th ed. abridged 1991).

[15] The relevant portion of section 6303(b.1) states: "The term 'child abuse' shall mean intentionally, knowingly or **recklessly** . . . [c]ausing bodily injury to a child through any recent act or failure to act." 23 Pa.C.S. § 6301(b.1)(1) (emphasis added). Bodily injury is defined under the CPSL as "[i]mpairment or physical condition or substantial pain." 23 Pa.C.S. § 6303(a). Moreover, for purposes of the CPSL, "A person acts recklessly with respect to a material element of an offense when he consciously disregards a substantial and unjustifiable risk that the material element exists or will result from his conduct." 18 Pa.C.S. § 302(b); *see* 23 Pa.C.S. § 6303 (definition of "recklessly" has same meaning as that set forth in section 302(b) of Crimes Code).

found that "the record established *prima facie* evidence that [Parents were two] of the perpetrators of child abuse as to [K.B.] under 23 Pa.C.S.[] § 6381(d), since [Parents were two] of the three primary caregivers for [K.B.] during the period when [K.B.] could have been injured." Trial Court Opinion, 3/3/20, at 12.

"The purpose of the CPSL is to bring about quick and effective reporting of suspected child abuse so as to serve as a means for providing protective services competently and to prevent further abuse of the children while providing rehabilitative services for them and the parents." ***In the Interest of J.R.W.***, 631 A.2d 1019, 1021 (Pa. Super. 1993), citing 23 Pa.C.S. § 6302(b). The CPSL "was created primarily for reporting suspected child abuse, providing the means for doing so and establishing the persons responsible for reporting the abuse[.]" ***Id. See also*** 23 Pa.C.S. §§ 6311-6319

Section 6381(d) of the CPSL, found under the subchapter titled "**Miscellaneous Provisions**," establishes a rebuttable, evidentiary presumption when a child incurs abuse not ordinarily suffered absent acts or omissions of a parent or other responsible party. Under such circumstances, "the fact of abuse suffices to establish *prima facie* evidence of abuse by the parent or person responsible." 23 Pa.C.S. § 6381(d) ("Evidence in court

proceedings").[16]  "Subsection (d) [of section 6381] provides for an attenuated standard of making a legal determination as to the abuser in child abuse cases."  **In the Interest of J.R.W.**, 631 A.2d at 1023.  To aid the Juvenile Court in determining whether a child has been abused, "the Legislature deemed it wise and necessary to establish a different evidentiary standard for finding child abuse by a parent or person responsible for the child's care, one in contrast to the overall standard for determining dependency under the Act."  *Id.*  The **J.R.W.** Court recognized:

> This lessened standard of establishing abuse by the caretakers [under section 6381(d)], coupled with the clear and convincing evidence necessary to find dependency, has been imposed by the Legislature as the standard which the Juvenile Court must apply in deciding abuse cases.  *Prima facie* evidence is not the standard that establishes the child has been abused, which must be established by clear and convincing evidence; it is the standard by which the court determines whom the abuser would be in a given case.  There is no conflict, constitutional or otherwise, with the clear and convincing evidence standard imposed by the Act to establish child abuse.  The Legislature has determined that the likelihood clearly established abuse has occurred, other than at the hands of the custodian, is so small that *prima facie* evidence the custodian has caused the injury, either by acts or omissions,

---

[16] Section 6381(d) provides:

> Evidence that a child has suffered child abuse of such a nature as would ordinarily not be sustained or exist except by reason of the acts or omissions of the parent or other person responsible for the welfare of the child shall be *prima facie* evidence of child abuse by the parent or other person responsible for the welfare of the child.

23 Pa.C.S. § 6381(d).

is all that is required. We find no defect in this reasoning. *Such a standard provides maximum protection for the child victim or other children in the community who might be subject to similar abuse if the alleged abuser was not identified and permitted free access to the victim or other vulnerable children. It is not equivalent to a finding of guilt in a criminal proceeding which could result in deprivation of freedom. Thus the [L]egislature has balanced the needs of society and children for protection against the abuser's possible patterned behavior and his/her right to freedom unless found guilty beyond a reasonable doubt.*[17]

_____

[17] Once the Juvenile Court has made a determination that child abuse has occurred, by clear and convincing evidence, a "founded report" may be lodged with the Department of Public Welfare [DPW] determining that the parents are the persons responsible for the abuse." **J.R.W.**, **supra** at 1025. Under the CPSL, "[t]he perpetrator of the abuse is notified of the report and his/her right, within 45 days, to seek expungement of the report[.]" **G.V. v. Dep't of Pub. Welfare**, 52A.3d 434, 447-47 (Pa. Commw. 2012), citing 23 Pa.C.S. §§ 6338(a), 6341(a); 55 Pa. Code §§ 3490.40, 3490.45, 3490.105a(a). Specifically, under section 6341(a)(1), "[a]t any time, the secretary may amend or expunge any record in the Statewide database . . . *upon good cause shown* and notice[.]" 23 Pa. C.S. § 6341(a)(1) (emphasis added). "Good cause shall include, but is not limited to, the following: (i) Newly discovered evidence that an indicated report . . . is inaccurate or is being maintained in a manner inconsistent with this chapter[;] or (ii) *A determination that the perpetrator in an indicated report of abuse no longer represents a risk of child abuse and that no significant public purpose would be served by the continued listing of the person as a perpetrator in the Statewide database*." **Id.** at § 6341(a)(1)(i), (ii) (emphasis added). In cases where a report is not expunged and the adult perpetrator's Social Security number and date of birth are not known, the indicated reports must be expunged when the child is 23 years of age. 23 Pa.C.S. § 6338(b); 55 Pa.Code § 3490.39(a). If the adult perpetrator's Social Security number and date of birth are known, certain information on the perpetrator is indefinitely maintained in a sub-file in the ChildLine Registry. **G.V., supra**, at 447. Finally, "[a]fter a hearing and a determination that a claim of abuse has a substantial basis, the [DPW] shares the information only with persons and agencies performing investigative and child protective functions, a child's examining or treating physician, a guardian *ad litem*, a court, federal auditors, and a prospective adoptive parent." **See R. v. Dep't of Pub. Welfare**, 636 A.2d 142, 151 (Pa. 1994); **see also** 23 Pa.C.S. § 6340 (Release of information in confidential reports).

*Id.* at 1024 (emphasis added). *See L.Z.*, 111 A.3d at 1184 ("The Legislature, however, carved out a very limited exception to these more stringent evidentiary standards, allowing for the possibility of identifying the perpetrator of abuse based on *prima facie* evidence in cases where the abuse is "of such a nature as would ordinarily not be sustained or exist except by reason of the acts or omissions of the parent[.]").

Under section 6381(d), a parent or other responsible caregiver may rebut the *prima facie* presumption with evidence:

> [d]emonstrating that the parent or responsible person did not inflict the abuse, potentially by testifying that they gave responsibility for the child to another person about whom they had no reason to fear or perhaps that the injuries were accidental rather than abusive. The evaluation of the validity of the presumption would then rest with the trial court evaluating the credibility of the *prima facie* evidence presented by . . . [DHS] . . . and the rebuttal of the parent or responsible person.

*L.Z.*, 111 A.3d at 1185. *See id.* at 1176 n.15 (section 6381(d) presumption may be rebutted with evidence that parent or responsible person was absent at time of injury and not otherwise responsible for injury by failing to secure proper care for child). A parent does not actually have to be physically present with the child at the time of the abuse for the presumption to apply to the child's parent. *Id.* at 1185-86.

In *N.B.-A.*, the Supreme Court reversed our en banc Court's holding, which had applied the section 6381(d) presumption and found that a mother had committed child abuse by omission. There, a mother took her six-year-old daughter to the emergency department at CHOP reporting that she had

been experiencing vaginal discharge for three days. Mother indicated she had no concerns that child may have been sexually abused. Mother told CHOP staff that she and child lived with child's maternal grandmother and that no males lived with them. After a physical examination, child was discharged from CHOP, with instructions to take baths and maintain good hygiene. The results of lab tests later revealed that child was suffering from a sexually-transmitted disease; mother was asked to return to CHOP with child for additional testing. Mother consistently denied that any males lived in the home with her and child; however, child told CPS caseworkers that three males lived with them, a stepfather and two of mother's stepsons. Mother and one stepson later tested positive for the same sexually-transmitted disease that child had. DHS obtained an order for protective custody. Child was placed in foster care. Child was adjudicated dependent. One month later, stepbrother was identified as the perpetrator of sexual abuse against child.

The trial judge, the Honorable Lyris F. Younge, did not find mother credible and ultimately entered an order finding that she was a perpetrator of sexual abuse under section 6303(b.1), concluded that aggravated circumstances existed pursuant to section 6302(2), and found that DHS was not required to continue to make reasonable efforts at reunification. 224 A.3d at 665-66. On appeal, our Court reversed the finding of aggravated circumstances, but affirmed the juvenile court's finding that mother was a perpetrator of child abuse under sections 6303(b.1) and 6381(d) of the CPSL.

In reaching its decision to reverse this Court, the Supreme Court concluded that:

> [T]he Superior Court . . . err[ed] in applying the [s]ection 6381(d) presumption . . . [where] **there was no evidence presented in th[e] case that [m]other perpetrated the abuse . . . [and] there was no evidence presented that [m]other knew or should have known that [c]hild was being abused, sexually or otherwise, as [the examining doctor] testified that [c]hild did not present any physical signs of injury or abuse when she initially examined her, and such testimony was consistent with the medical records from CHOP**, which indicated that [c]hild did not have any signs of physical injury or abuse, aside from the vaginal discharge reported by [m]other.
>
> * * *
>
> Accordingly, we hold that the [s]ection 6381(d) presumption is not applicable where there is no evidence that the parent or other person responsible for the welfare of the child knew or should have known of the abuse or risk of abuse and disregarded it. **As DHS failed to offer any evidence that [c]hild's abuse was of such a nature as would ordinarily not be sustained or exist except by reason of the acts of omissions of the parent or other person responsible for the welfare of the child, the Superior Court erred in applying the [s]ection 6381(d) presumption**.

*Id.* at 674, 675 (emphasis added). Moreover, there was no evidence that child ever reported being sexually abused; in fact, child continually denied that she had been sexually abused. Finally, because DHS presented no evidence that mother knew or should have known that stepson posed a risk to child, but ignored that risk, the Court concluded "we cannot find that the abuse in this case was of a type that would ordinarily not occur except for the acts or omissions of the child's caretaker." *Id.* at 675.

- 20 -

The instant case is sufficiently distinguishable from the facts of **N.B.-A.**

Unlike the mother in **N.B.-A.**, Mother and Father were both aware that K.B.

had been injured before they took him to Virtua. Also unlike the child in **N.B.-A.**, here K.B. was an infant when the abuse occurred, and, thus, incapable of

describing that abuse. The most notable distinction, however, is Dr. Brennan's

determination that K.B.'s fractures were non-accidental and "most likely the

result of inflicted trauma." N.T. 11/8/19, at 24. In his medical opinion, K.B.'s

injuries were inflicted intentionally and caused by force being applied to his

arm in a "yanking-type" motion; injuries that would have caused him

substantial or severe pain. **Id.**, at 31-32.

In **L.Z.**, **supra**, the Pennsylvania Supreme Court provided additional

guidance on applying the section 6381(d) presumption — specifically, in cases

that involve multiple caregivers responsible for the care and protection of an

abused child when the evidence fails to demonstrate definitively which

individual inflicted the abuse. In **L.Z.**, the Court reviewed whether our Court

erred in not applying the presumption in such cases "where the record fails to

establish that the child was in the parent's care at the time of the injury." **Id.**

at 1176, citing **In the Interest of L.Z.**, 91 A.3d 208, 216 (Pa. Super. 2014).

The child in **L.Z.**, who was 21-months-old, was brought to the hospital by his

mother and maternal aunt[18] to be treated for a deep cut that extended nearly

---

[18] Maternal aunt and mother lived together and were both child's primary
caregivers.

halfway around the base of his penis. Hospital doctors also observed a dark bruise around the buckle area (above the jawbone and below the cheekbone) on both of child's cheekbones. The bruises were somewhere between a day and a week old at the time child arrived at the hospital. Child also suffered from severe diaper rash and a yeast infection.

Child's injuries were determined to be consistent with abuse and inconsistent with several explanations given by mother and aunt. Aunt claimed that child caused his own injuries by tugging on his penis during a diaper change. Mother, who acknowledged at the hospital that she and aunt were child's primary caretakers, claimed that she had been visiting a paramour for the two days prior to the hospital visit and had not seen child since that time. Concluding that the child's injuries were non-accidental, hospital staff filed a report with DHS. A report was also prepared by CPS; aunt was indicated as a perpetrator of abuse in the CPS report.[19] Child was placed in protective custody. DHS filed dependency and aggravated circumstances petitions.

At an adjudicatory hearing, a doctor testified that child's cheek bruises were "common abuse injur[ies;]" a medical director of the hospital's pediatric inpatient unit, who also examined child, opined that child was abused. *Id.* at 1167. Following the hearing, the trial court entered an order adjudicating

---

[19] The mother was not indicated as a perpetrator of abuse either by commission or omission in the CPS report. However, a general protective service's report was substantiated against mother for lack of supervision and for child suffering from a yeast infection.

child dependent, found it was in his best interest to be removed from mother's home, and, significantly, found that child was a victim of abuse under section 6303 and that mother was the perpetrator of such abuse.  Finally, the court concluded that aggravating circumstances existed and, therefore, that DHS did not need to make further efforts to reunify child with mother.

In her Rule 1925(a) opinion, the trial judge stated that she found clear and convincing evidence established that child was without parental care and that child's injuries would not have occurred "but for [m]other's omissions as his primary caretaker."  *Id.* at 1169.  On appeal, mother claimed that the court erred in finding that she was responsible for child abuse; our Court affirmed the dependency adjudication, but vacated the court's determination that mother was the perpetrator of the abuse.  Our Court granted the guardian *ad litem*'s petition for reargument en banc and, consistent with our panel decision, affirmed the dependency adjudication and vacated the perpetrator of abuse determination.   Notably, in reaffirming the panel's decision to vacate the finding that mother was the perpetrator of child's abuse, the en banc panel held that section 6381(d) does not permit a court to designate a parent as a perpetrator of abuse "where the record fails to establish that the child was in the parent's care at the time of the injury." *L.Z.*, 91 A.3d at 216.

In reversing our Court, the Supreme Court came to the following conclusions regarding section 6381(d)'s rebuttable presumption:  (1) there is no requirement that a parent be physically present at the time of the injury; and (2) the inclusion of the word "omissions" in section 6381(d), encompasses

situations where the parent or responsible person is not present at the time of the injury but is, nonetheless, responsible due to his or her failure to provide protection for the child. *L.Z.*, 111 A.3d at 1184. In so holding, the Court recognized those cases, like the present, often involve "multiple caregivers . . . that circle the wagons," and "children [that] may be too young . . . to describe the abuse," and, thus, "CYS agencies are left to prove [these] case[s] with only the physical evidence of injuries that would not ordinarily be sustained but for the action of the parents or responsible persons and the implausible statements of the parents or responsible persons." *Id.* at 1185.

Here, the medical evidence presented by DHS demonstrated that like child's injures in *L.Z.*, K.B.'s injuries were neither accidental nor self-inflicted and were of such a nature that they would not ordinarily be sustained except by reason of the acts or omissions of the parent or other person responsible for K.B.'s welfare. The trial court reasonably concluded, based upon testimony from caseworker Gilmore, that K.B.'s injuries occurred sometime after Babysitter #1, K.B.'s sitter, left for the evening on the 13th and when he awoke on the 14th. In addition, the trial judge concluded, based on medical testimony, that because K.B.'s injuries were so substantial and would have caused him considerable pain, K.B. had not yet sustained his injuries when he was sleeping on his side when Parents returned home at 10 p.m. on the 13th. *See In the Interest of R.J.T.*, 9 A.3d 1179, 1190 (Pa. 2010) (the Court required to defer to trial court's credibility findings if they are supported by evidence of record). Accordingly, we concur with the trial judge that the

section 6381(d) *prima facie* presumption of abuse was established with regard to Mother and Father. ***See In re S.L.***, 202 A.3d 723, 729-30 (Pa. Super. 2019) (section 6381(d) presumption properly applied to mother where: child suffered non-accidental injuries; mother among adults responsible for child when injuries occurred; and mother denied knowing how child injured); ***see also In re J.R.W.***, ***supra*** at 1023 (presumption protects those innocent victims of abuse who are "too young . . . to describe their abuse" and necessary in cases where "agencies [are left] . . . to prove their case with only physical evidence of injuries that would not ordinarily be sustained but for the action of the parents or responsible persons.").

Moreover, Mother and Father failed to rebut the presumption by presenting evidence or testimony from themselves, Paternal Grandmother, or either babysitter establishing that K.B. was not in their care when he suffered his injuries, and that they had no reason to question their decision to leave child in babysitters' and Paternal Grandmother's care.[20] Under these circumstances, we conclude that the trial court properly found that Mother and Father were perpetrators of abuse under section 6381(d).[21] The presumption

---

[20] Parents did not note any concerns in medical records about their childcare providers to CHOP medical staff. ***See*** N.T. Dependency/Abuse Hearing, 11/8/19, at 27.

[21] We believe the trial judge did an exemplary job in what was, no doubt, a very difficult case. The trial judge noted that his conclusion that the section 6381(d) presumption applied in the matter "doesn't mean that [K.B.'s] parents are bad parents either. It just means that somehow the child got hurt

is the only means that a court has to ensure that a child (here, an infant) will remain safe when, under their parents' care, they have been abused and the identity of the perpetrator is not able to be established. In essence, it forces caregivers either to come forward with the identity of the perpetrator of abuse or be assigned fault where it was their responsibility to care for the child and keep him or her safe. As emphasized by our Supreme Court in *L.Z.*, "when a child is in the care of multiple parents or other persons responsible for care, those individuals are accountable for the care and protection of the child whether they actually inflicted the injury or failed in their duty to protect the child." *L.Z.*, 111 A.3d at 1185.[22]

_____

in such a way that nobody can explain [it]." N.T. Dependency/Abuse Hearing, 12/16/19, at 179. He applied the presumption appropriately, made sure that the family goal remained reunification, ordered that Mother and Father's older children remain in their care and custody, and ensured that Mother and Father would attend appropriate parenting classes and receive necessary evaluations, while permitting the twins to remain in kinship care with Paternal Grandmother who supervised twice-weekly visits with Parents. In short, the judge made it very clear that he wanted this family to be able to get through this ordeal and reunite as a family unit. *See* 23 Pa.C.S. § 6302(b) (one of many purposes of CPSL is to "stabilize and protect the integrity of family life where ever appropriate").

[22] Contrary to the dissent that would conclude Mother and Father sufficiently rebutted the section 6381(d) presumption, we do not find the evidence sufficiently proved that Parents relinquished all control of parental duties with regard to K.B. to Paternal Grandmother at the time Child sustained his non-accidental injuries. In such cases, "[t]he evaluation of the validity of the presumption . . . rest[s] with the trial court evaluating the credibility of the prima facie evidence presented by the CYS agency and the rebuttal of the parent or responsible person." *L.Z.*, 111 A.3d at 1185. Simply put, we do not find that Parents' countervailing rebuttal evidence was "substantial" enough to reverse the trial court's determination. *Id.* at 1180 (section

Father's and Mother's next issues concern the trial court's adjudication of Children as dependent.[23] Specifically, they contend that because they are not responsible for K.B.'s injuries, the trial court's dependency determination is erroneous. Having already determined that Father and Mother were both properly found to be perpetrators of abuse to K.B., this issue is moot. **See In re R.P.**, 957 A.2d 1205, 1213 (Pa. Super. 2008) (stating where trial court finds one sibling dependent due to abuse, court may determine other siblings also dependent, even if they have not been abused).

Finally, Father and Mother argue that the trial court erred in determining that it was clearly necessary to remove K.B. and A.B. from their care where that determination "was made based on the abuse to K.B." and where "[n]either Mother nor Father are responsible for this injury." Father's Brief, at 19; Mother's Brief, at 19. Again, as we have affirmed the court's finding of

_____

6381(d) presumption "can be rebutted, like other statutory presumptions, with countervailing competent, substantial evidence.") (emphasis added). **See also In re S.G.**, 922 A.2d 943, 947 (Pa. Super. 2007) (trial court, not appellate court, is charged with responsibilities of evaluating credibility of witnesses and resolving any conflicts in testimony; when trial court's findings are supported by competent evidence of record, we will affirm even if record could also support opposite result).

[23] Our scope of review in child dependency cases "is limited in a fundamental manner by our inability to nullify the fact-finding of the lower court." **In re Read**, 693 A.2d 607, 610 (Pa. Super. 1997). We accord great weight to the hearing judge's findings of fact because he is in the best position to observe and rule upon the credibility of the witnesses. **Id.** "Relying on this unique posture, we will not overrule the findings of the trial court if they are supported by competent evidence." **Id.**

- 27 -

abuse perpetrated by Father and Mother with regard to K.B., this issue is moot.

Orders affirmed.

Judge King joins this Memorandum.

Judge Strassburger files a Dissenting Memorandum.


*Judgment Entered.*

*Joseph D. Seletyn, Esq.*
*Prothonotary*


*Date: 9/2/2020*