J-S36017-25

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT O.P. 65.37**

| | | |
|---|---|---|
| IN THE INTEREST OF: J.S.H.-M., A MINOR IN THE INTEREST OF: K.J.M., A MINOR IN THE INTEREST OF: C.D.H., A MINOR | : : : : : : : | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| APPEAL OF: BLAIR COUNTY CHILDREN YOUTH AND FAMILIES | : : : | |
| | : | No. 708 WDA 2025 |

Appeal from the Order Entered May 14, 2025
In the Court of Common Pleas of Blair County Orphans' Court at No(s):
2024 AD 45

BEFORE:   PANELLA, P.J.E., NICHOLS, J., and FORD ELLIOTT, P.J.E.[*]

MEMORANDUM BY NICHOLS, J.:                    **FILED:  January 22, 2026**

Appellant Blair County Children Youth and Families (the Agency) appeals from the orphans' court's order[1] denying the Agency's petition to involuntarily terminate the parental rights of J.M.M. (Father) to C.D.H., K.J.H., and J.S.H.-M. (collectively Children).  The Agency argues that the orphans' court erred by concluding that the Agency failed to establish the grounds for terminating Father's parental rights by clear and convincing evidence.  We affirm.

The orphans' court summarized the factual history as follows:

[Father] and [Mother] are the natural parents of three minor children, [C.D.H.], DOB 6/**/2020; [K.J.H.], DOB 2/**/2022; and [J.S.H.-M.], DOB 2/**/2024.  The parents have never been

---

[*] Retired Senior Judge assigned to the Superior Court.

[1] J.R.H.'s (Mother) parental rights to Children were terminated on the same date within the same order.  Mother filed separate appeals from the termination order, which we address in a separate memorandum.

married. Father has two other minor children who are twins and who live with Father. Father has raised the twins on his own since the time they were 18 months old. Both are scheduled to graduate from high school in the near future and one of them plans to work for a year and then decide on a long-term plan and the other plans to attend college. The twins have succeeded academically and both work after school. One of the twins also competes in track. The twins appear to be successful and raised well under their Father's care.

[C.D.H.] was adjudicated dependent on April 20, 2022 and was placed in [a] foster home. [K.J.H.] was adjudicated dependent on March 14, 2022 and placed in the [the same foster home as C.D.H.]. Mother was incarcerated in 2022 and released in November of 2022 after resolving charges of simple assault and harassment. It is clear that Mother has struggled with mental health issues and had been attempting to address those issue[s] at one time with Doo Whan Cho, M.D. in late 2022 and early 2023. However[,] Mother's attempts to address her mental health issues trailed off thereafter and those issues remain un-redressed. The parties had an on-again, off-again relationship which resulted in the birth of [J.S.H.-M.] in February of 2024.

A voluntary safety plan was agreed upon by the parties on February 18, 2024 after [J.S.H.-M.]'s birth when Mother tested positive for non-prescription tricyclics. The plan was for the child to live with his parents with Father to be the primary caretaker and to fully supervise the child. However, an argument between the parents led Father to attempt to evict Mother from the home despite the fact that Mother was nursing [J.S.H.-M.]. This court granted an emergency protective order and [J.S.H.-M.] was life-flighted to Children's Hospital of Pittsburgh on suspicion of jaundice and meningitis. [J.S.H.-M.] was ultimately discharged and placed in [a different foster home than his brothers] and reunification services were provided.

Mother's mental health issues made clear that she was unfit to care for [] Children. Father testified that this was clear soon after [C.D.H.] was born when Mother was nominally primarily caring for [C.D.H.]. Even though Father's paternity was initially in doubt, he testified that neither [C.D.H.] nor [K.J.H.] was ever left with Mother unsupervised. Mother was always with Father or Mother's grandmother when she had the older boys, Father also testified that despite paternity doubts he always treated [] Children as his own.

Reunification services with the parents jointly did not work due to disputes between the parents. The Agency became concerned with Mother's inability to care for [] Children and Father's lack of protective instincts and actions as to [] Children with respect to Mother. As explained below, the hearings established that the Agency is also concerned relative to Father's own parenting skills in regards to protection of [] Children.

Reunification efforts afforded the parents visitation through FICS,[2] Kid's First, and the Agency itself. In summary, with detail to follow below, reunification with Mother essentially failed. As to Father, reunification efforts remain problematic according to the Agency, despite the fact that all parties appear to agree, as does the court, that Father's visitations and efforts were more successful.

The Agency filed petitions for the termination of parental rights as to both Mother and Father as to all three Children on December 30, 2024. The Agency brings its petition[s] as to [C.D.H.] and [K.J.H.] pursuant to 23 Pa.C.S.[] § 2511(a)(2), (5), (8) and (b) and as to [J.S.H.-M.] pursuant to 23 Pa.C.S.[] § 2511(a)(2), (5) and (b). The Agency also filed petitions seeking to change the primary permanency goal from return home to adoption.

Hearings on this case were conducted on January 30, 2025, April 22, 2025, and April 29, 2025.[3] Mother appeared on the first day

---

[2] Family Intervention Crisis Services. **See** N.T., 1/30/25, at 50; **see also In re S.G.**, 922 A.2d 943, 945 (Pa. Super. 2007).

[3] Children were represented by Tyler A. Rowles, Esq., who served both as Children's guardian *ad litem* (GAL) and as Children's legal counsel. **See** Orphans' Ct. Order, 1/2/25 (appointing Attorney Rowles as both GAL and Children's legal counsel). In its May 14, 2025 opinion and order, the orphans' court concluded that Attorney Rowles could serve in both roles because there was no conflict between Children's best interests and legal interest "especially in light of the tender ages of [] Children." Orphans' Ct. Op. & Order, 5/14/25, at 21. We note that the orphans' court is obligated to determine whether a conflict in dual representation exists **prior** to appointing counsel. **See In re Adoption of K.M.G.**, 240 A.3d 1218, 1236 (Pa. 2020). However, we decline to elevate form over substance and conclude that the orphans' court fulfilled its obligation to determine whether a conflict in dual representation existed. **See id.** at 1235-37; 23 Pa.C.S. § 2313(a); **see also In re S.L.M.R.'S.**, 3156 *(Footnote Continued Next Page)*

of this three-day hearing but did not appear on the last two days of hearing. Mother's counsel attempted to contact Mother on several occasions to no avail. Mother did however file a PFA[4] petition against Father arising out her last contact with Father on March 23, 2025[,] when Father called law enforcement to remove Mother from Father's home. The temporary PFA petition was denied and Mother failed to appear for the following PFA hearing, and as such it was dismissed. Father and his current licensed professional counselor, Joanne Butz, opined that Mother had filed the PFA petition to sabotage his present efforts to obtain custody of [] Children. We agree with that contention and give no weight to Mother's filing of the PFA petition.

The Agency presented exhibits and the following witnesses in support of its petitions: Terry O'Hara, Ph.D., a licensed psychologist with forensic specialty; Ashley Cadle, owner and operator of Nursery Rhymes Child Care Center; Erin Rummell, an assistant teacher at daycare for [C.D.H.] and [K.J.H.]; Jeannie Lashlee, a clinician providing behavioral services to [C.D.H.] and [K.J.H.] from Youth Advocate Programs; Shannon Cameron, family services supervisor at Kid's First; Britton Mau[k] FICS Supervisor; and Ariel Icen[h]our, [an Agency] caseworker.

Father presented exhibits and the testimony of [S]hantel Green, [an Agency] case aide; Danielle Barkman, [an Agency] case aide unit supervisor; Joanne Butz, Father's licensed professional counselor; and Father himself.

Mother presented no evidence.

Orphans' Ct. Op. & Order, 5/14/25, at 1-5 (footnote omitted and some formatting altered).

By an opinion and order dated May 13, 2025, and entered May 14, 2025, the orphans' court denied the Agency's petition to involuntarily terminate

---

EDA 2024, 2025 WL 1554922, at *2 n.5 (Pa. Super. filed June 2, 2025) (unpublished mem.); Pa.R.A.P. 126(b) (stating this Court may rely on unpublished decisions of this Court filed after May 1, 2019, for their persuasive value).

[4] The Protection From Abuse Act, 23 Pa.C.S. §§ 6101-6122.

Father's parental rights. The Agency timely filed a notice of appeal[5] and a concise statement of errors complained of on appeal pursuant to Pa.R.A.P. 1925(a)(2)(i) and (b). The orphans' court filed a Rule 1925(a) opinion adopting the reasoning of its May 14, 2025 opinion and order.

On appeal, the Agency presents the following issues:

1. Whether the [orphans'] court erred in its decision to deny [the Agency]'s petition to involuntarily terminat[e] the parental rights of the father, J.M.M., pursuant to 23 Pa.C.S.[] § 2511(a)(2), (a)(5) and (a)(8).

2. Whether [the Agency] presented clear and convincing evidence after analyzing the developmental, physical and emotional needs and welfare of the subject children, J.S.H.-M., K.J.M., and C.D.H., to support an involuntarily termination of the parental rights of the father, J.M.M., pursuant to 23 Pa.C.S.[] § 2511(b).

Agency's Brief at 3.

We begin with our well-settled standard of review:

The standard of review in termination of parental rights cases requires appellate courts to accept the findings of fact and credibility determinations of the trial court if they are supported

_____

[5] We note that although the Agency failed to file separate notices of appeal at each orphans' court docket number pursuant to **Commonwealth v. Walker**, 185 A.3d 969 (Pa. 2018), and its progeny, we nonetheless decline to quash the Agency's appeal or remand for the filing of corrected notices of appeal. Here, the record reflects that although the trial court advised Mother of her appellate rights, the trial court failed to advise the Agency of its appellate rights. **See** Orphans' Ct. Op. & Order at 24 (unpaginated); **see also In re K.M.W.**, 238 A.3d 465, 469-70 (Pa. Super. 2020) (*en banc*) (declining to quash the appeal after concluding that a breakdown in the court system occurred when the trial court informed the appellant that she could seek relief by filing a single appeal from multiple trial court docket numbers); **Commonwealth v. Larkin**, 235 A.3d 350, 352-54 (Pa. Super. 2020) (*en banc*).

- 5 -

by the record. If the factual findings are supported, appellate courts review to determine if the trial court made an error of law or abused its discretion. A decision may be reversed for an abuse of discretion only upon demonstration of manifest unreasonableness, partiality, prejudice, bias, or ill-will. The trial court's decision, however, should not be reversed merely because the record would support a different result. We have previously emphasized our deference to trial courts that often have first-hand observations of the parties spanning multiple hearings.

*In re H.H.N.*, 296 A.3d 1258, 1263 (Pa. Super. 2023) (citations omitted); *see also In re Q.R.D.*, 214 A.3d 233, 239 (Pa. Super. 2019) (explaining that "the trial court is free to believe all, part, or none of the evidence presented, and is likewise free to make all credibility determinations and resolve conflicts in the evidence" (citation omitted and some formatting altered)).

Further, our Supreme Court has explained:

even where the facts could support an opposite result, as is often the case in dependency and termination cases, an appellate court must resist the urge to second guess the trial court and impose its own credibility determinations and judgment; instead we must defer to the trial judges so long as the factual findings are supported by the record and the court's legal conclusions are not the result of an error of law or an abuse of discretion.

*In re Adoption of S.P.*, 47 A.3d 817, 826-27 (Pa. 2012) (citation omitted).

Termination of parental rights is governed by Section 2511 of the Adoption Act, 23 Pa.C.S. §§ 2101-2938, which requires a bifurcated analysis.

Initially, the focus is on the conduct of the parent. The party seeking termination must prove by clear and convincing evidence that the parent's conduct satisfies the statutory grounds for termination delineated in Section 2511(a). Only if the court determines that the parent's conduct warrants termination of his or her parental rights does the court engage in the second part of the analysis pursuant to Section 2511(b): determination of the needs and welfare of the child under the standard of best interests

of the child. One major aspect of the needs and welfare analysis concerns the nature and status of the emotional bond between parent and child, with close attention paid to the effect on the child of permanently severing any such bond.

*In re L.M.*, 923 A.2d 505, 511 (Pa. Super. 2007) (citations omitted). We need only agree with the orphans' court as to any one subsection of Section 2511(a), as well as Section 2511(b), to affirm an order terminating parental rights. *In re B.L.W.*, 843 A.2d 380, 384 (Pa. Super. 2004) (*en banc*).

### Section 2511(a)(2)

The Agency argues that the orphans' court erred by concluding that evidence was insufficient to terminate Father's parental rights pursuant to Section 2511(a)(2). Agency's Brief at 11-14, 19-27. Specifically, the Agency contends that the orphans' court "erred in its analysis of the testimony presented[]" regarding Father's inability to protect Children from Mother and safety concerns regarding Father's parenting skills. *Id.* at 19. The Agency asserts that Dr. O'Hara; Shannon Cameron, a Kid's First family services supervisor; and Britton Mauk, FICS's reunification program supervisor, all testified that Father was not able to maintain appropriate boundaries with Mother. *Id.* at 19-21. Particularly, the Agency claims that Ms. Cameron's testimony that Father had told her that he would always take care of Mother and maintain a relationship with Mother "directly contradicts the findings" of the orphans' court. *Id.* at 21-22; *see also id.* at 25 (the Agency asserted that "[c]ontrary to the trial court's finding that [] Father had sufficiently changed his perspective regarding [] Mother," Mr. Mauk testified that Father

has stated that Mother was not the threat that others considered her to be). Likewise, the Agency contends that the orphan's court's emphasis on the testimony of Joanne Butz, Father's counsellor is "misplaced" because Ms. Butz acknowledged that Father "needs to continue to work on" his ability to distance himself from Mother. *Id.* at 25 (citing N.T., 4/29/25, at 62-64).

Additionally, the Agency argues that the evidence establishes that Father has not remedied his lack of protective capacity. *Id.* at 22-27. Specifically, the Agency contends that Ms. Cameron and Mr. Mauk testified that Father refused to follow their recommendations regarding the safe supervision, care, and transportation of Children, and instead Father would minimize the risks that they had brought to Father's attention. *Id.* at 22-23. Further, the Agency claims that the orphans' court erred by emphasizing the testimony of Danielle Barkman, an Agency case aide unit supervisor and Shantel Green, an Agency case aide that they had no safety concerns about Father's visitation with Children because neither Ms. Barkman nor Ms. Green were responsible for assessing Father's parenting skills. *Id.* at 24. The Agency further argues that the orphans' court's "decision fails to reconcile how the persistent disagreements [] Father continued to have with his service providers led to its conclusion that [] Father had done virtually everything the agency had asked, which provides another case in point of the conflation of compliance with progress." *Id.* at 23-24.

The Agency concludes that "[a]lthough the [orphans'] court acknowledged many of the concerns cited by both FICS and Kids First, it

essentially dismissed those concerns on an individual basis as instances not

rising to the level of a safety threat[]" and "failed to recognize the aggregate

pattern these concerns presented, not only in volume, but also in duration."

***Id.*** at 26.

Section 2511(a)(2) provides as follows:

**(a) General rule.**—The rights of a parent in regard to a child may be terminated after a petition filed on any of the following grounds:

\* \* \*

(2) The repeated and continued incapacity, abuse, neglect or refusal of the parent has caused the child to be without essential parental care, control or subsistence necessary for his physical or mental well-being and the conditions and causes of the incapacity, abuse, neglect or refusal cannot or will not be remedied by the parent.

23 Pa.C.S. § 2511(a)(2).

To satisfy the requirements of [Section] 2511(a)(2), the moving party must prove (1) repeated and continued incapacity, abuse, neglect or refusal; (2) that such incapacity, abuse, neglect or refusal caused the child to be without essential parental care, control or subsistence; and (3) that the causes of the incapacity, abuse, neglect or refusal cannot or will not be remedied. The grounds for termination are not limited to affirmative misconduct, but concern parental incapacity that cannot be remedied.

***In re C.M.K.***, 203 A.3d 258, 262 (Pa. Super. 2019) (citations and quotation

marks omitted).

Additionally, this Court has explained:

Unlike subsection (a)(1), subsection (a)(2) does not emphasize a parent's refusal or failure to perform parental duties, but instead emphasizes the child's present and future need for essential

parental care, control or subsistence necessary for his physical or mental well-being. Therefore, the language in subsection (a)(2) should not be read to compel courts to ignore a child's need for a stable home and strong, continuous parental ties, which the policy of restraint in state intervention is intended to protect. This is particularly so where disruption of the family has already occurred and there is no reasonable prospect for reuniting it[.]

*In re E.A.P.*, 944 A.2d 79, 82 (Pa. Super. 2008) (citations omitted and formatting altered).

Further, this Court has stated that a "child's need for consistent parental care and stability cannot be put aside or put on hold." *In re K.M.W.*, 238 A.3d 465, 474 (Pa. Super. 2020) (*en banc*) (citation omitted and some formatting altered).

Thus, while "sincere efforts to perform parental duties," can preserve parental rights under subsection (a)(1), those same efforts may be insufficient to remedy parental incapacity under subsection (a)(2). "Parents are required to make diligent efforts toward the reasonably prompt assumption of full parental responsibilities." *In re A.L.D.*[, 797 A.2d 326, 340 (Pa. Super. 2002)]. A "parent's vow to cooperate, after a long period of uncooperativeness regarding the necessity or availability of services, may properly be rejected as untimely or disingenuous." *Id.*

*In re Z.P.*, 994 A.2d 1108, 1117-18 (Pa. Super. 2010) (some citations omitted and formatting altered).

Here, the orphans' court explained:

We find that the Agency has failed to demonstrate that the causes of Father's neglect cannot or will not be remedied. Indeed, we find that Father has remedied the cause of his issues, primarily his past inability to protect [] Children from Mother. To be clear, we recognize that the Agency contends that Father's failure to protect [] Children from Mother is not the only basis for its [TPR] petitions. While the Agency indeed does contend that Father's

- 10 -

lack of the ability to safeguard [] Children from the neglect of Mother, it also contends that Father himself has neglected [] Children such that his supervision of them renders them unsafe. We simply find that the evidence of record does not support the Agency's position.

First, as to Mother, the Agency was well-grounded in its concern that Father lacked the will to protect [] Children from Mother. Father's own testimony indicated that he viewed Mother as someone deserving of empathy as the mother of his children. However, Father has taken the major step of eliminating Mother from his life and that of [] Children by not permitting her back in his home, to the point of having called law enforcement to remove her in March of 2025. This step has undoubtedly been a long time in coming.

We accept [] Father's testimony that he has come to the realization that Mother cannot be a part of the life of [] Children. This is supported by the testimony of Ms. Butz, whose testimony we find creditable and credible. Father has realized that empathy for Mother has really been enabling her to continue on her downward spiral and more importantly, that it has seriously compromised the welfare of [] Children and his opportunity to be their father.

We also credit Father for the efforts he has made to rectify the situation. We find that Father has done virtually everything that has been asked of him. He has obtained a new and larger home. He has obtained a vehicle that will accommodate . . . Children as well as his twins. He has been to every visitation and he has done so while keeping a job for 22 years while raising his twins on his own.

His visitations with [] Children at [the Agency] have all been positive according to not only Father but also according to Ms. Barkman and Ms. Green. He brings food; he plays with [] Children; [] Children are happy to see him; his interactions with [] Children are all appropriate; he reads to [] Children; he changes [J.S.H.-M.'s] diapers; he cuddles with them. Most importantly, Ms. Barkman and Ms. Green confirmed that there are no safety concerns and that [] Children respond to him.

Dr. O'Hara had more optimism for Father than for Mother. According to Dr. O'Hara, Father did relatively well with his observed interactions with [] Children. Dr. O'Hara was concerned with Father's inability to limit or eliminate Mother's contacts with

[] Children. Dr. O'Hara opined, as of his last visit with Father, that Father's issues with Mother were unlikely to change. As stated above, we find that Dr. O'Hara's prediction in this regard did not come to fruition as Father has convinced the court that he has taken concrete steps to dispel Mother from his life and the lives of [] Children.

Dr. O'Hara also had concerns with the protective capacity of Father in his own right. For example, Dr. O'Hara noted that [C.D.H.] removed Dr. O'Hara's scissors from their compartment and Father struggled to preempt that. Dr. O'Hara nevertheless noted Father's attributes in praising [] Children, engaging with them, re-directing them when necessary, being playful with them and remaining calm. It is noted that these observations were made when Father was dealing with all three Children in a place foreign to them. At the time of Dr. O'Hara's last report in April of 2024, Dr. O'Hara noted that there would be some advantages to allowing Father more time to continue to progress. Of note, Dr. O'Hara commented in his report that [] "Children clearly value their relationships with [Father] and [Father] has been able to demonstrate sufficient parenting skills over several evaluations." Dr. O'Hara's last report noted the disadvantages being that [] Children have been out of Father's care for a substantial amount of time and that Father would allow Mother access to [] Children. Those concerns are important but they do not have to do with Father's own parenting skills with [] Children and we have accepted Father's assertion that [] Dr. O'Hara's latter concern has been addressed by Father.

* * *

Ms. Cameron's testimony was the most strident in support of the Agency's [TPR] petitions. Ms. Cameron testified that Father attends visits consistently and that his home is fit for [] Children. Ms. Cameron testified that Father puts in a lot of effort but he still struggles to meet the safety needs of [] Children in her view. Her critique of Father's ability to meet the safety needs of [] Children is manifold.

One major theme in her testimony is Father's struggle to get [] Children into and out of his car. In December of 2024, visits were moved from Father's house to Kid's First because Ms. Cameron testified that [C.D.H.] began running away toward the street and Father did not react in prompt fashion. Father has a different view of the incident and testified that [C.D.H.] was in no danger, at

least 150 feet from the street, and he knew that Ms. Cameron was there and able to assist which she did. In any event, this issue has been experienced by others including the [the Agency] case aide. Father testified that he has rectified the issue by holding [J.S.H.-M.] and getting the other boys in the car, then he secures [J.S.H.-M.] and then the other older boys.

Another example occurred when [C.D.H.] was pulling on a televisions [sic] stand and Ms. Cameron felt that there was a danger of [the stand] falling on [C.D.H.]. Father testified that [C.D.H.] was never in any danger and that any potential for harm could be remedied by wall-mounting the television.

Ms. Cameron indicated that Father was using lollipops too often to control the behavior by [] Children whereas Father indicated that he was taught to use the "if-then" method for positive reinforcement. Father claims that he is following the guidance of the behavioral specialist whom he visits in Huntingdon County, which he arranged without assistance from the Agency. Nevertheless, he now uses lollipops less and uses peanut butter crackers instead.

Ms. Cameron cited an incident in April of 2025 where [C.D.H.] slid off the couch when he was sleeping. She also takes issue with how Father feeds [] Children, refusing to heed her advice to feed them together. She testified that Father fails to pick up on [J.S.H.-M.'s] prompts for more food. Father testified that he feeds [] Children with good food and appropriately, and that he prefers to focus on the child he is feeding.

On another occasion, [C.D.H.] grabbed a butter knife off a table. Ms. Cameron testified that this another example of Father's failure to be able to foresee and pre-empt a potentially dangerous situation. Father testified that he immediately grabbed [C.D.H.'s] wrist when he picked up the butter knife and no threat ever existed.

Ms. Cameron is frustrated with Father because when these things occur, she believes Father either does not heed her advice or offers a different version of what actually occurred. She testified that he refuses to accept her coaching and she wished he would not exclude her suggestions.

Despite all of these concerns, it is worth mentioning that there was no evidence presented that [] Children have ever been harmed while with Father. We do not perceive that the evidence

- 13 -

presented by Ms. Cameron warrants a conclusion that Father poses a danger to [] Children. The types of issues raised by Ms. Cameron are not of the gravity necessary for the termination of parental rights.

Mr. Mau[k]'s testimony was similar to that of Ms. Cameron's although less strident. He identified two issues with Father, his lack of protective actions as to Mother and his own parenting skills. We have already addressed Father's dealings with Mother. Mr. Mau[k] recognized that Father's attendance at visits was outstanding. However, he was critical of Father's way of feeding [] Children and noted one incident where [C.D.H.] was standing on a play table and Father did not seem to react. Again, there was no injury to [C.D.H.]. Like Ms. Cameron, Mr. Mau[k] was frustrated that Father would disagree with some of FICS' suggestions. Some of these disagreements were petty such as Father's use of the word "grounding" as opposed to "time out".

\* \* \*

Ms. Butz has been counseling Father for about 2 years. She noted that Father has a suitable home, has kept a steady job for over 20 years, raised two good children on his own, and has no drug or alcohol issues. She has focused on getting Father to realize the difference between helping Mother and enabling Mother. Father now realizes that despite his feelings for Mother, having her in his life and the lives of [] Children is dangerous for [] Children. Father has recognized that Mother has attempted to sabotage his efforts to obtain custody of [] Children, most recently by filing a clearly spurious PFA petition. Ms. Butz testified that Father's eyes have now opened relative to Mother and the court accepts this testimony.

Orphans' Ct. Op. & Order, 5/14/25, at 12-18 (citations omitted).

Following our review of the record, we discern no abuse of discretion by the orphans' court. *See H.H.N.*, 296 A.3d at 1263. The record establishes that Father has cut ties with Mother, understands that Mother has deficits in her protective capacity, and Father testified that he will comply with a court order that Children are to have no contact with Mother. *See* N.T., 4/29/25,

- 14 -

at 60-61, 64-65, 118-21, 161-62. Father also testified about how he has addressed issues related to Children's safety and parenting techniques that various custody supervisors had raised with him. *See id.* at 85-104, 145-49. The orphans' court expressly credited Father's testimony and the testimony of Father's therapist, Ms. Butz. *See* Orphans' Ct. Op. & Order, 5/14/25, at 12-13, 18. The Agency is essentially asking this Court to reweigh factual evidence presented at the TPR hearings and to substitute our conclusion for that of the orphans' court, which this Court will not do. *See S.P.*, 47 A.3d at 826-27 (stating that "even where the facts could support an opposite result, as is often the case in dependency and termination cases, an appellate court must resist the urge to second guess the trial court and impose its own credibility determinations and judgment" (citation omitted)). Because the orphans' court's factual findings and credibility determinations are supported by the record, we decline to reweigh the evidence or to interfere with those credibility determinations. *See id.*; *see also H.H.N.*, 296 A.3d at 1263; *Q.R.D.*, 214 A.3d at 239.

For these reasons, we conclude that the orphans' court did not abuse its discretion by concluding that the Agency failed to present clear and convincing evidence that Father could not or would not be remedy the incapacity, abuse, neglect or refusal that caused Children to be without essential parental care. *See H.H.N.*, 296 A.3d at 1263; *C.M.K.*, 203 A.3d at 262. Therefore, the Agency is not entitled to relief on this issue.

## Section 2511(a)(5) & (a)(8)

The Agency's next two arguments are related; therefore, we address them together. The Agency argues that the orphans' court "conflated" its analysis of Section 2511(a)(8) regarding C.D.H. and K.J.H. with its analysis under subsection (a)(5) "in a manner that did not highlight the significant differences between the elements required to assess those two subsections." Agency's Brief at 14. The Agency notes that "it is undisputed that C.D.H. and K.J.H. have been in placement for well over 12 months at the time" the Agency filed its TPR petitions. *Id.* The Agency contends that orphans' court erred in its analysis because the orphans' court went "to great lengths to highlight [] Father's compliance with services," even though "a parent's current willingness or ability to remedy the conditions that initially caused placement or the availability or efficacy of Agency services." *Id.* at 15 (quoting *Z.P.*, 994 A.2d at 1118). The Agency claims that the record establishes that Father still has to work on his ability to distance himself from Mother. *Id.* at 25.

The Agency also argues that the orphans' court's analysis of the best interests of Children for the purposes of Section 2511(a)(5) and (a)(8) "appears to be incomplete . . . ." *Id.* at 15. Specifically, the Agency argues that the orphan's court "fail[ed] to highlight the testimony provided by Dr. Terry O'Hara" regarding Children's bonds with Father and with their respective foster parents. *Id.* at 16-18.

Section 2511(a) provides, in relevant part:

**(a) General rule.**—The rights of a parent in regard to a child may be terminated after a petition filed on any of the following grounds:

\*    \*    \*

(5) The child has been removed from the care of the parent by the court or under a voluntary agreement with an agency for a period of at least six months, the conditions which led to the removal or placement of the child continue to exist, the parent cannot or will not remedy those conditions within a reasonable period of time, the services or assistance reasonably available to the parent are not likely to remedy the conditions which led to the removal or placement of the child within a reasonable period of time and termination of the parental rights would best serve the needs and welfare of the child.

\*    \*    \*

(8) The child has been removed from the care of the parent by the court or under a voluntary agreement with an agency, 12 months or more have elapsed from the date of removal or placement, the conditions which led to the removal or placement of the child continue to exist and termination of parental rights would best serve the needs and welfare of the child.

23 Pa.C.S. § 2511(a)(5), (8).

This Court has explained:

In order for termination pursuant to 23 Pa.C.S.[] § 2511(a)(5) to be proper, the following factors must be demonstrated: (1) the child has been removed from parental care for at least six months; (2) the conditions which led to the child's removal or placement continue to exist; (3) the parents cannot or will not remedy the conditions which led to removal or placement within a reasonable period of time; (4) the services reasonably available to the parents are unlikely to remedy the conditions which led to removal or placement within a reasonable period of time; and (5) termination of parental rights would best serve the needs and welfare of the child.

*In re Adoption of M.E.P.*, 825 A.2d 1266, 1273-74 (Pa. Super. 2003) (citation omitted).

To involuntarily terminate a parent's parental rights under 23 Pa.C.S. § 2511(a)(8), the Court must find that the petitioner proved by clear and convincing evidence that "(1) the child has been removed from the care of the parent for at least twelve months; (2) the conditions that led to the removal or placement of the child continue to exist; and (3) termination of parental rights would best serve the needs and welfare of the child." *In re I.J.*, 972 A.2d 5, 11 (Pa. Super. 2009) (citation omitted).

Further, this Court has explained regarding the third prong of Section 2511(a)(8) that

> initially, the focus in terminating parental rights is on the parent, under Section 2511(a), whereas the focus in Section 2511(b) is on the child. However, Section 2511(a)(8) explicitly requires an evaluation of the "needs and welfare of the child" prior to proceeding to Section 2511(b), which focuses on the "developmental, physical and emotional needs and welfare of the child." Thus, the analysis under Section 2511(a)(8) accounts for the needs of the child in addition to the behavior of the parent. Moreover, only if a court determines that the parent's conduct warrants termination of his or her parental rights, pursuant to Section 2511(a), does a court engage in the second part of the analysis pursuant to Section 2511(b): determination of the needs and welfare of the child under the standard of best interests of the child. Accordingly, while both Section 2511(a)(8) and Section 2511(b) direct us to evaluate the "needs and welfare of the child," we are required to resolve the analysis relative to Section 2511(a)(8), prior to addressing the "needs and welfare" of [the child], as proscribed by Section 2511(b); as such, they are distinct in that we must address Section 2511(a) before reaching Section 2511(b).

*In re C.L.G.*, 956 A.2d 999, 1008-09 (Pa. Super. 2008) (*en banc*) (citations omitted and some formatting altered).

Here, the orphans' court explained:

As set forth above, we do not find that the criticisms of Father by the Agency's witnesse[s] demonstrate by clear and convincing evidence that Father's actions or inactions warrant a termination of his parental rights. We have also credited the testimony of Father and Ms. Butz that his failure to recognize and protect [] Children from Mother has changed. Father's eviction of Mother from his home by resorting to calling law enforcement demonstrates this change in dynamic.

Despite our conclusion that the Agency has failed to meet its burden on the second part of the subsection (a)(5) analysis, we will also address the [needs and welfare of the child prong]. We recognize the statutory scheme of providing permanency within 18 months and we accept Dr. O'Hara's opinion that [] Children need permanency. In this case, however, there is clearly a bond between Father and [] Children which should not be severed. Father has provided love and comfort to [] Children. His consistent attendance at all visitations is uncontroverted. [] Children positively respond to Father and clearly have affection for him.

The Agency's efforts have been reasonable but marginally so. Despite the fact that the goal has been return home, we find no good explanation for the Agency's failure to include Father with the services provided by Youth Advocate Program and Ms. Lashlee. Likewise, the safety concerns noted by Mr. Mau[k] and Ms. Cameron at Father's home seem to the court to have been readily remedied so as to allow visits at Father's home.

While we recognize the difficulty in the work of the Agency, it must recognize that when the goal is return home, there must be a level of cooperation with the parent as opposed to expecting blanket obedience by the parent. While we feel for and applaud the foster parents, we cannot conclude that the Agency has presented clear and convincing evidence that termination of Father's parental rights would best serve the needs and welfare of [] Children.

The same analysis as applied to Section (a)(5) applies here recognizing that section (a)(8) applies only to [C.D.H.] and

- 19 -

[K.J.H.] We note additionally however that the appellate courts have instructed us to examine whether the child has a beneficial bond with the biological parent and the effect of severing any such bond, and whether the child is bonded to pre-adoptive foster parents. We have done so here and while we recognize that the pre-adoptive foster parents have a beneficial bond with Father.

Orphans' Ct. Op. & Order, 5/14/25, at 19-20 (header and citation omitted, some formatting altered).

Following our review of the record, we discern no abuse of discretion by the orphans' court. *See H.H.N.*, 296 A.3d at 1263. As stated above, Father has cut ties with Mother and has addressed issues related to Children's safety that have occurred during Father's supervised visitation with Children. *See* N.T., 4/29/25, at 60-61, 64-65, 85-104, 118-21, 145-49, 161-62. Further, the orphans' court expressly credited Father's testimony and the testimony of Father's therapist, Ms. Butz. *See* Orphans' Ct. Op. & Order, 5/14/25, at 19. The Agency again asks this Court to substitute our conclusion for that of the orphans' court, which this Court will not do. *See S.P.*, 47 A.3d at 826-27. Because the orphans' court's credibility determinations are supported by the record, we decline to reweigh the evidence. *See id.*; *see also H.H.N.*, 296 A.3d at 1263; *Q.R.D.*, 214 A.3d at 239.

For these reasons, we conclude that the orphans' court did not abuse its discretion by concluding that the Agency failed to present clear and convincing evidence that the conditions that led to the removal or placement of Children continued to exist. *See H.H.N.*, 296 A.3d at 1263; *M.E.P.*, 825 A.2d at 1273-

74; ***I.J.***, 972 A.2d at 11. Therefore, the Agency is not entitled to relief on these issues.

Because we conclude that the Agency is not entitled to relief on its claims related to Section 2511(a), we need not address the Agency's argument related to Section 2511(b). ***See L.M.***, 923 A.2d at 511 (explaining that a court only engages in an analysis under Section 2511(b) if the court has determined that a "parent's conduct warrants termination of his or her parental rights" under one of the subsections of Section 2511(a) (citation omitted)).

For the reasons stated above, we affirm the orphans' court order denying the Agency's TPR petitions with respect to Father.

Order affirmed. Jurisdiction relinquished.

Judgment Entered.

Benjamin D. Kohler, Esq.
Prothonotary

DATE: 1/22/2026